Thomas E. MOSHEIM and Sol Jamail, Appellants,

v.

UNITED STATES of America, Appellee.

No. 18216.

United States Court of Appeals Fifth Circuit.

Dec. 23, 1960.

Rehearing Denied Jan. 19, 1961.

Jack Binion, Houston, Tex., for appellants.

William B. Butler, U. S. Atty., Houston, Tex., Fred L. Hartman, Asst. U. S. Atty., Houston, Tex., for appellee.

Before TUTTLE, Chief Judge, and RIVES and JONES, Circuit Judges.

RIVES, Circuit Judge.

Upon waiver of a jury trial,[1] the defendants were tried to the court without a jury, and each of them was found guilty of making a false oath in a bankruptcy proceeding [2] and of conspiracy to swear falsely in such proceeding.[3]

The second count of the indictment charged that Mosheim testified falsely before the trustee in bankruptcy that neither he, personally, nor any business venture with which he was associated, nor his "office overhead" received any of the money that was paid to Jamail for his services to the Texas Portland Cement Company. The third count charged that Jamail testified falsely before the trustee to the effect that none of said money was given to Mosheim. The fourth count charged that Mosheim and Jamail entered into a conspiracy to testify falsely before the trustee.

The questions presented upon appeal relate to the sufficiency of the evidence to sustain the judgments of conviction. As to the substantive counts, the claims of insufficiency are limited to that part of the evidence relating to the falsity of the oath and the intent required.

Mosheim had been instrumental in obtaining a $600,000 loan to the Texas Portland Cement Company secured by a first mortgage on the Company's plant. The loan was obtained on January 14, 1957, from Bishop Nold of the Galveston Diocese of the Catholic Church. On June 30 of that year, Mosheim was elected a member of the Board of Directors of the Company. He remained a director until the filing of the petition for the reorganization of the Company. The loan was payable in three annual installments of $200,000 each, plus interest at the rate of 7% per annum. When the first principal installment became due on January 14, 1958, the corporation was unable to meet its obligation. The Bishop was persuaded to accept a check for the interest on the loan, $42,000, and to grant a moratorium to the Company under an arrangement for the pledging of invoices of the Company to the Bishop in the amount of $2,500 per week. The Bishop suggested that the bookkeeping arrangements involved and the collection of the funds for him be handled through Mosheim's office.

Mosheim, an attorney at law, shared his office space and secretarial help with Jamail, an investment broker. Diehl, the President of the Company, testified that he entered into an arrangement with Mosheim and Jamail under which the Company was to pay to Jamail $833.33 per month for Mosheim's and Jamail's services in securing the extension of the loan and in the keeping of records necessitated by the pledging of invoices. That agreement was evidenced by a letter from Diehl to Jamail copied in the margin.[4] Diehl testified that Mosheim in-

---

1. Rule 23(a), Federal Rules of Criminal Procedure, 18 U.S.C.A.

2. "§ 152. *Concealment of assets; false oaths and claims; bribery*

   * * * * *

   "Whoever knowingly and fraudulently makes a false oath * * * in or in relation to any bankruptcy proceeding * *

   * * * * *

   "Shall be fined not more than $5,000 or imprisoned not more than five years, or both." 18 U.S.C.A. § 152.

3. 18 U.S.C.A. § 371—On the count charging conspiracy, Mosheim was fined $7,500 and given a thirteen-month suspended sentence and Jamail was fined $5,000 and given a nine-month suspended sentence. On the substantive counts, each was given a suspended sentence—Mos-

   heim for thirteen months, Jamail for nine months, the sentences to run concurrently with the sentences imposed on the conspiracy count.

4.                              "March 11, 1958.

   "Mr. Sol Jamail
   "Pioneer American Building
   "711 Main Street
   "Houston, Texas
   "Dear Mr. Jamail:
   "This letter will confirm our understanding between you and the Texas Portland Cement Company wherein you will be paid $10,000 per year on a monthly basis effective this current month for your successful negotiation with The Most Reverend W. J. Nold wherein the Texas Portland Cement Company is to be permitted to pay out its mortgage on the basis of assigning a minimum of $2500

sisted on the payments being made through Jamail, "because he (Mosheim) was a director of the Texas Portland Cement Company, he thought it would be better not to be receiving the payments personally."

The Texas Portland Cement Company issued its check No. 1041, dated April 3, 1958, to the order of Sol Jamail in the amount of $833.33, supported by voucher showing that the check was "payment for services rendered in connection with accounting and managerial services account of the Most Reverend W. J. Nold." There was some indication that the check was post-dated. It was endorsed and deposited to Jamail's bank account on April 3, 1958. On the same day there was deposited to Mosheim's bank account a check dated April 2, 1958, signed by Jamail, payable to the order of Mosheim, in the amount of $416.66, which bore on its face the notation, "½ fee from Texas Portland Cement Company for services rendered." That check was endorsed by typewriter, "For deposit only to account of T. R. Mosheim," but was not signed or endorsed in person by Mosheim.

Miss Julia M. Bradley, who acted as secretary for both Jamail and Mosheim, testified that she prepared the check to Mosheim upon Jamail's instructions and presented it to Jamail for his signature, but that she did not know whether Mosheim ever saw the check, "because sometimes I would send money to his bank, and as you will see, I used the typewriter and put 'For deposit only'." She further testified that Jamail usually owed Mosheim on the running account for their joint office expenses; that she had entered the $416.66 to the credit of Mosheim on his ledger sheet as income; that Mosheim sometime later told her that

was wrong and to put the full amount to Jamail's credit on his running account for office expenses. She further testified: "Q. Will you state why? A. He said, 'I am a director of that company, and I cannot take this money.'" She complied with Mosheim's direction. It is not necessary to detail the more complicated facts and circumstances concerning two other checks referred to in the indictment.

Jamail had testified positively in the bankruptcy proceeding that none of the compensation for services was ever given directly or indirectly to Mosheim. Mosheim had testified that he did not receive from Jamail any portion of the money remitted to Jamail by the Company for these services. He further testified:

"Q. Did the office overhead, that is your legal office, did it receive any portion of the money that was paid to Mr. Jamail by the Texas Portland Cement Company? A. No, sir. The source of his funds used in paying his portion of the expenses, in other words, I don't know where he got the money. I am not passing on that, but as far as anything coming out of those proceeds to me or for my benefit or to any corporation or company in which I have a financial interest, no, sir."

The federal courts adhere to the rule that in prosecutions for perjury the uncorroborated oath of one witness is not enough to establish the falsity of the testimony of the accused.[5] In Hammer v. United States, supra note 5 (271 U.S. at page 626, 46 S.Ct. at page 604), the Court found it unnecessary to consider whether every false oath in bankruptcy is perjury. And, in Gold v. United

per week in installments to Mr. Thomas E. Mosheim, Trustee for the Most Reverend W. J. Nold. You will be issued a check monthly on the basis of $10,000 per year as payment to you, not only negotiating the loan but for your service in keeping the records and the payment

to The Right Reverend W. J. Nold, in accordance with our agreement.
"Very truly yours,
"Texas Portland
Cement Company
"Kent B. Diehl, Sr.
"KBD:edd        President."

5. Hammer v. United States, 1926, 271 U.S. 620, 626, 46 S.Ct. 603, 70 L.Ed. 1118;

States, 1957, 352 U.S. 985, 986, 77 S.Ct. 378, 1 L.Ed.2d 360, the Court, over Mr. Justice Clark's dissent, declined to consider the applicability of the perjury rule of evidence to the False Statement Statute (18 U.S.C.A. § 1001). The Seventh Circuit in United States v. Marachowsky, 1953, 201 F.2d 5, 9, pointed out the possible legal difference between the crime of a false oath in bankruptcy proceedings and perjury, but found it not necessary to ground its decision upon any such distinction. Our position on the present appeal permits of a like course.

■ The testimony of Miss Julia Bradley, secretary to Mosheim and Jamail, was to the effect that, when Jamail received the check for $833.33 from Texas Portland Cement Company, he told her to write a check to Mosheim for ½ of it, that she did prepare such a check with the notation on the face of it, that Jamail signed the check, and that it was deposited to Mosheim's bank account. True, according to her testimony, Mosheim may then have had no knowledge of his receipt of the $416.66. When he did discover it, however, it appears that he was aware of its source, because he stated to her: "I am a director of that company and I cannot take this money." Instead, however, of returning the money, he simply directed the secretary to change the bookkeeping entries so as to credit it to Jamail's account on his running debt to Mosheim. Miss Bradley's testimony is not unfriendly to her former employers, and is almost conclusively corroborated by the documentary evidence. Further strong corroboration is furnished by the testimony of Mr. Diehl. We conclude, therefore, under the strict rule obtaining in perjury cases, that there was ample evidence as against both Mosheim and Jamail to establish the falsity of the oath and the intent required.

■ As to the conspiracy count, the rule is well established that participation in a criminal conspiracy need not be proved by direct evidence, but that a common purpose and plan may be inferred from the circumstances.[6] Mosheim and Jamail shared offices and were associates in various business deals. As has been seen, both testified falsely that Mosheim did not receive any of the money paid by Texas Portland Cement Company to Jamail. Both also testified that Mosheim had no interest in a separate corporation which discounted the invoices or due bills of Texas Portland Cement Company and made a profit therefrom. Both Jamail and Mosheim had guaranteed in writing the performance of some of the obligations of that corporation. Diehl testified that the principals involved in that corporation were Diehl, Mosheim and Jamail. The name of the corporation was Delmojam. Diehl testified that when the corporation was being formed in the offices of Mosheim and Jamail, "I said it sounded like something to eat, and they said it was a contraction of the names Diehl, Mosheim and Jamail." Both Mosheim and Jamail, however, had a different explanation for the peculiar name. According to Mosheim's testimony before the trustee in bankruptcy, it came from "Deliver more jam. In other words, make some more money." Jamail in his testimony in the bankruptcy proceeding claimed to be the sole stockholder of Delmojam, and, likewise, testified that the name came from the phrase "deliver more jam." There was, we think, ample evidence of the conspiracy and of the participation therein of Jamail and Mosheim. The judgments of conviction are

Affirmed.

Weiler v. United States, 1945, 323 U.S. 606, 608, 65 S.Ct. 548, 89 L.Ed. 495; McWhorter v. United States, 5 Cir., 1952, 193 F.2d 982; Cuesta v. United States, 5 Cir., 1956, 230 F.2d 704.

6. Glasser v. United States, 1941, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680; Direct Sales Company v. United States, 1943, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674; Blumenthal v. United States, 1947, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154; Delli Paoli v. United States, 1956, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278.