**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Norman JACOBS and George Kastenbaum, Defendants-Appellants.**

**No. 30019.**

United States Court of Appeals, Fifth Circuit.

Sept. 29, 1971.

Rehearing and Rehearing En Banc Denied Nov. 17, 1971.

Certiorari Denied Feb. 28, 1972. See 92 S.Ct. 1170.

---

Irwin J. Block, Barry N. Semet, Miami, Fla., for Norman Jacobs.

Raymond W. Bergan, Washington, D. C., for George Kastenbaum.

Beckham & McAliley, Max Kogen, Miami, Fla.

Robert W. Rust, U. S. Atty., Miami, Fla., James H. Walsh, Special Atty. Dept. of Justice, Tampa, Fla., Will R. Wilson, Asst. Atty. Gen., Criminal Division, U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before JOHN R. BROWN, Chief Judge, and PHILLIPS * and INGRA-HAM, Circuit Judges.

PHILLIPS, Circuit Judge:

George Kastenbaum and Norman Jacobs were charged in a two-count indictment with violations of 18 U.S.C. § 1951.

The first count charged them with a conspiracy to violate § 1951, supra, and the performance of a large number of overt acts, some by Jacobs and some by

Kastenbaum, to effect the object of the conspiracy.

The second count charged them with the "attempt" to violate § 1951, supra.[1]

18 U.S.C. § 1951 in part here pertinent reads as follows:

"§ *1951. Interference with commerce by threats or violence*

"(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

"(b) As used in this section—

\* \* \* \* \* \*

"(2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

"(3) The term 'commerce' means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction."

Count I of the indictment in part here pertinent reads as follows:

"COUNT I

"1. That all times hereinafter mentioned Kastle Tours, Incorporated, was a Florida corporation engaged in the night club and restaurant tour business in the City of Miami Beach, Florida and its environs.

---

* Of the Tenth Circuit, sitting by designation.

1. See more complete statement of charges, infra.

"2. That at all times pertinent hereto, Raymond and Rosemarie Casella were the owners and operators of Kastle Tours, Inc. and were actively engaged in the operation of said corporation.

"3. That at all times hereinafter mentioned the tour business of Kastle Tours, Inc. included the furnishing of guided night club and restaurant tours to tourists visiting the State of Florida from points located without the State of Florida.

"4. That at all times hereinafter mentioned the tour business of Kastle Tours, Inc. included the direct solicitation of out of state prospective customers for their guided tours within the State of Florida.

"5. That at all times hereinafter mentioned Kastle Tours, Inc., in connection with the continuation of business regularly utilized in business operations, and sought to utilize in business operations, surface transportation consisting of vehicles, supplies, and materials made and produced by manufacturers and suppliers in states other than the State of Florida, said vehicles, supplies and materials having been transported in interstate commerce.

"6. That at all times pertinent hereto, George Kastenbaum was a member of the Bar of the State of Florida with law offices at Number One Lincoln Road Building, 169 Lincoln Road, Miami Beach, Florida; and Norman Jacobs was the Manager of Central Cab Company on Miami Beach, Florida.

"7. That from on or about a date occurring in the middle of December 1968, and continuously thereafter up to and including March 19, 1969, the exact dates being to the Grand Jury unknown, in the Southern District of Florida, and elsewhere, George Kastenbaum and Norman Jacobs, the defendants herein, and other persons to the Grand Jury unknown, did unlawfully and wilfully conspire, confederate, and agree together and with each other, to obstruct, delay and affect interstate commerce, as the term 'commerce' is defined in Section 1951, Title 18, United States Code, and the movement of persons, articles, and commodities in commerce by extortion as the term 'extortion' is defined in Section 1951, Title 18, United States Code, that is to say the defendants herein mentioned conspired to obtain the sum of fifty thousand ($50,000.00) dollars in cash from Raymond Casella, of the aforesaid Kastle Tours, Inc., with the consent of Raymond Casella being induced and obtained by the wrongful use of actual and threatened fear directed at said Raymond Casella."

It will be observed that the statute reads "actual or threatened * * * fear." That is, in defining the term "extortion" the statute uses the word "actual" and the word "threatened" in the disjunctive. On the other hand, it will be observed that the indictment charges "induced and obtained by the wrongful use of actual and threatened fear." Thus, it will be seen that the indictment uses the word "actual" and the word "threatened" in the conjunctive. As we shall hereafter show, that was proper pleading and it was sufficient if the Government showed a conspiracy to use either actual or threatened fear, since such terms were pleaded in the conjunctive.

The second count of the indictment alleged and incorporated therein paragraphs 1, 2, 3, 4, 5, and 6 of Count I and further alleged:

"2. That from approximately December 1968 to March 1969, in the Southern District of Florida, * * * the defendants herein did unlawfully and wilfully *attempt to commit extortion* as that term is defined in Title 18, United States Code, Section 1951, and that said extortion as contemplated, if completed, would have obstructed, delayed, and affected commerce, that is to say, said defendants did attempt to obtain property in the amount of $50,000 United States currency and fifteen per cent of the profit

of Kastle Tours, Inc. from Raymond Casella of the aforesaid Kastle Tours, Inc. with his consent induced by wrongful use of actual and threatened fear of economic injury, and that said attempt, if completed, would have obstructed, delayed and affected commerce; all in violation of Title 18, United States Code, Section 1951" (Emphasis supplied.)

It will again be observed that while the statute uses the words "actual or threatened * * * fear" in the disjunctive, the indictment charges it in the conjunctive, and what we have said above with respect to Count I applies equally to Count II.

Both of the defendants were convicted on Count I. Kastenbaum was convicted and Jacobs was acquitted on Count II.

Kastenbaum was sentenced to imprisonment for five years on his conviction on Count I and to imprisonment for three years on his conviction on Count II. The sentences imposed on Kastenbaum were to run concurrently.

It will be observed that § 1951, supra, defines three offenses where robbery is not involved, namely, extortion, attempted extortion, and conspiracy to commit extortion or attempted extortion, which obstruct, delay, or affect interstate commerce.[2]

It will be noted that Count II charges the defendants with "unlawfully and wilfully" attempting to commit extortion by obtaining from Casella "with his consent induced by wrongful use of actual and threatened fear of economic injury."

▪ Here again, we repeat that while the statute in defining the term "extortion" uses the language, "induced by wrongful use of actual or threatened * * * fear," thus using the disjunctive between the words "actual" and "threatened," the indictment uses the conjunctive in its charge. Thus, the use of the conjunctive "and" between the word "actual" and the word "threatened" was the proper way to allege it in the indictment, and it was sufficient if the evidence established either actual or threatened fear. That is especially true because the pleader charged, not extortion, but the substantive offense of "attempt to commit extortion." However, if Jacobs was convicted and sentenced on Count I only and Kastenbaum was convicted on both counts and was sentenced to five years' imprisonment on Count I and only three years' imprisonment on Count II, to run concurrently with the sentence on Count I, if we sustain the conviction on Count I, it is not necessary for us to consider the legality of the conviction on Count II.[3]

2. In United States v. Floyd, 7 Cir., 228 F.2d 913, cert. denied, 351 U.S. 938, 76 S.Ct. 835, 100 L.Ed. 1466, the court at page 919 quoted with approval the following language from Hulahan v. United States, 8 Cir., 214 F.2d 441, 445, as follows:

" 'It seems apparent from the language of the statute that it was the intent of Congress to protect interstate commerce against *extortion or attempted extortion* which in any way or in any degree reasonably could be regarded as affecting such commerce. * * *' " (Emphasis supplied.)

In the Floyd case, the court then stated further:

"Thus, the offense consists of two essential elements, (1) extortion or attempted extortion, and (2) that such extortion or attempted extortion affect interstate commerce. * * *"

See also: United States v. Green, 350 U.S. 415, 420, 76 S.Ct. 522, 100 L.Ed. 494; United States v. Tropiano, 2 Cir., 418 F.2d 1069, 1075; United States v. Stirone, 3 Cir., 262 F.2d 571, 574.

3. Muir v. United States, 5 Cir., 373 F.2d 712, 713; Rhodes v. United States, 5 Cir., 224 F.2d 348, 352; Huff v. United States, 5 Cir., 301 F.2d 760, 765; Lance v. United States, 5 Cir., 409 F.2d 698, 699; United States v. Bigham, 5 Cir., 421 F.2d 1344, 1346; Galbraith v. United States, 10 Cir., 387 F.2d 617, 619; Roviaro v. United States, 353 U.S. 53, 65, 77 S.Ct. 623, 1 L.Ed.2d 639; Lawn v. United States, 355 U.S. 339, 362, 78 S.Ct. 311, 2 L.Ed.2d 321; Schutz v. United States, 10 Cir., 432 F.2d 25, 29; Glazerman v. United States, 10 Cir., 421 F.2d 547, 552; Price v. United States, 10 Cir., 384 F.2d 650, 652; See also, United States v. Tropiano, 2 Cir., 418 F.2d 1069, 1083.

■■ Under § 1951, supra, it is not necessary to show that a person charged with extortion or attempted extortion actually received any benefit.[4] A conspiracy to commit one of the substantive offenses defined in the statute and such substantive offense do not merge.[5]

■ We now turn to a consideration of the evidence and the determination of whether it supports the conspiracy charge.

■ In passing on the sufficiency of the evidence to support the verdict of guilty in a criminal case, an appellate court will not weigh conflicting evidence nor consider the credibility of witnesses, and it must view the evidence and the reasonable inferences that may be drawn therefrom in the light most favorable to the prosecution and determine as a question of law whether there is substantial evidence, either direct or circumstantial, to support the verdict.[6]

Persons who enter into a conspiracy to commit a criminal offense do not do so openly, and generally a conspiracy can be established only by evidence of the attendant circumstances and the concerted acts and conduct of the alleged conspirators and the inferences reasonably deductible therefrom that logically and consistently warrant the conclusion that an unlawful agreement, express or implied, existed.[7]

The evidence and the reasonable inferences that might be drawn therefrom, considered in a light most favorable to the prosecution, afforded ample basis for the jury to have found the following facts:

Shortly before the middle of December 1968, Raymond Casella had started to operate a night club tour business in Miami Beach, Florida. From the beginning, he had trouble obtaining bus transportation for his tour patrons. He tried Gray Line, American Sightseeing, Red Top, Greyhound and Trailways, and did not succeed in obtaining transportation from any one of them. Finally, he arranged with A–1 Bus Company to furnish him with bus transportation.

Thereafter, Casella was told by a police sergeant from Miami Beach that he could not continue to use A–1 buses, because that company did not have a permit from the Public Service Commission of Florida to operate tour service or charter buses in Miami Beach. The police sergeant's name was Buddy Dresner. Dresner suggested that Casella see Jacobs, who operated a cab business and was then serving Elegante Tours with his cabs.

In the forenoon of a day shortly after the middle of December 1968, Casella went to see Jacobs at the latter's office in a building located at 1613 Alton Road, Miami Beach. Casella's office was located in the same building. At that time Casella understood that Jacobs's name was Norman Rubin. On entering Jacobs's office, he saw a young lady and told her he wanted to see Norman. She went into another room. Jacobs then appeared and introduced himself as Norman.

4. United States v. Green, 350 U.S. 415, 418, 76 S.Ct. 522, 100 L.Ed. 494; United States v. Provenzano, 3 Cir., 334 F.2d 678, 685, cert. denied 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544.

5. Carbo v. United States, 9 Cir., 314 F.2d 718, 733, cert. denied 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498; See also, cases cited in note 11, infra.

6. Steiger v. United States, 10 Cir., 373 F.2d 133, 135; Etheridge v. United States, 5 Cir., 380 F.2d 804, 809; Williamson v. United States, 5 Cir., 365 F.2d 12, 14;

Feutralle v. United States, 5 Cir., 209 F.2d 159, 161; Sykes v. United States, 5 Cir., 373 F.2d 607, 609; Gorman v. United States, 5 Cir., 323 F.2d 51, 52.

7. Heald v. United States, 10 Cir., 175 F.2d 878, 880; Butler v. United States, 10 Cir., 197 F.2d 561, 563; Bacon v. United States, 10 Cir., 127 F.2d 985, 986; Wilson v. United States, 5 Cir., 320 F.2d 493, 494; Rodriguez v. United States, 5 Cir., 373 F.2d 17; Jordan v. United States, 10 Cir., 370 F.2d 126, 128; Mosheim v. United States, 5 Cir., 285 F.2d 949, 952.

Casella explained to Jacobs that he was starting a night club tour business and the difficulties he was having in obtaining bus transportation; that he tried to get transportation from Gray Line, American Sightseeing, Red Top, Greyhound and Trailways to no avail; that he finally got transportation from A–1 Bus Company; that shortly after it began furnishing him transportation he was told by a police sergeant of Miami Beach that he would have to cease using A–1 bus transportation, because it did not have a permit to operate in Miami Beach; that the sergeant suggested he see Jacobs, who was in the cab business and was then furnishing cabs to Elegante Tours, and that possibly Jacobs could help him out.

Casella then went to see Jacobs and asked Jacobs if he would furnish him with cabs. Jacobs said he was in the cab business to make money and the more business he got, the more money he would make; that he had no contract that he knew of with Elegante Tours that would prevent him from furnishing cabs to Casella; that he would furnish cabs to Casella at the same rate he was charging Elegante Tours, and handed Casella an Elegante Tours rate sheet. Casella then said he was running a bus tour and that his brochure advertisement stated that it was a bus tour, but that he was forced into a situation where he had to use cabs. Casella used Jacobs's cabs for one night about the middle of December 1968, but the day following such night of use Jacobs saw Casella and told him he could no longer furnish him cabs, because Elegante Tours had telephoned Jacobs and told him it had a contract with him, and if he furnished Casella any more cabs it would sue him.

Casella said, "Well, what am I going to do now, Norman? I'm at my wit's end." Jacobs replied, "I have a very good transportation attorney. He's done a lot of things for us and helped us out, and I'm sure if you talked to him he may be able to help you. * * * But why don't I make an appointment with him for you and you see him and talk to him

and tell him your problem and see what he can do." Casella replied, "Norm, I'll see anybody."

A day or two later, Jacobs advised Casella that he had made the appointment for December 22, 1968. On that date, Casella and his wife went to Kastenbaum's office at One Lincoln Road, Miami Beach.

We digress to say that Casella identified both Jacobs and Kastenbaum at the trial.

With his wife present, Casella told Kastenbaum about his inability to obtain buses to transport his tour patrons; that he had talked to Norman and he suggested that Casella see Kastenbaum and see what he "could do" for him.

Counsel for Jacobs then objected to any testimony of what Kastenbaum said in the absence of Jacobs. The court then properly instructed the jury with respect to acts and declarations made before the conspiracy came into existence or that were not in furtherance of the conspiracy or made after it had terminated, and charged the jury that such acts or declarations could only be considered as evidence against the person who had done such acts or made such declarations, but that when it was established to their satisfaction by the evidence that a conspiracy existed and that a defendant was one of its members, then the acts and declarations of such other members of the conspiracy, done or made in furtherance of the conspiracy and during its existence, were binding on the defendant member, whether done or made in or out of his presence. The court then overruled the objection.

Casella then told Kastenbaum in detail how he had tried without success to obtain bus transportation from Gray Line, American Sightseeing, Red Top, Greyhound, Trailways, and Metro; that he had arranged then with A–1 Bus Company to furnish him with transportation by bus; that shortly after A–1 Bus Company began to furnish him with buses a Miami Beach police sergeant stopped that, because A–1 did not have a permit to

operate in Miami Beach; that he then went to Norman and the latter agreed to furnish him with cabs, which he did for a few days, but that Norman then found out that his contract with Elegante Tours prevented him from furnishing cabs to Casella, and he told Casella that he could no longer furnish him with cabs.

Kastenbaum then said:

"Look. You are new here. You are fighting a giant, which is Greyhound. You are fighting this giant. You are fighting the Segal brothers who have donated money to every political campaign. They have thrown cocktail parties and they have helped in the campaigns of political figures not only in Miami Beach but in the country and in the state. They are very powerful people, I know, because I've been fighting them for nine years.

"And, second of all, I want you to know I'm on the other side, too. I am transportation attorney for the cabs in this town, and we are fighting against having buses on the streets. We don't want buses here. And you are asking me to go both ends. You just don't do it."

Casella replied, "Mr. Kastenbaum, I've got to do something. Can you help me in any way? I'm desperate. I need help."

Kastenbaum then said:

"The political structure, * * * the way it is here, * * * you can't do it. You just can't walk in because you are new people. They don't know you and you don't know them. You have to have a good attorney with a good fee. You can't go to a councilman and offer him $100. You have to give him at least $1,000 or $1,500, and even then you can't be sure, because you never know what these men are going to do."

Casella then said, "Well, what would it cost, Mr. Kastenbaum, to get a permit? What would it cost me?"

Kastenbaum replied, "Well, I probably could swing it for $10,000." Casella then said, "I don't have that money."

About December 23, 1968, Casella contacted Metro and it agreed to furnish him with buses with which to transport his customers and started to do so.

Casella reserved a bus from Metro for the night of December 26, 1968. He had received for that night in excess of 40 reservations, but later he discovered that about 14 of them were false reservations. Casella operated his tours with Metro buses from December 26, 1968, to January 13, 1969.

On January 9, 1969, Jacobs went to Casella's office and said to Casella, "Ray, I heard a rumor." He said further that there was a cocktail party at the Segal home and "they were circulating a rumor that they were going to stop you from operating. They were going to stop the buses. Metro isn't going to give you any buses."

Casella replied, "Norman, I can't believe that, because Metro promised us definitely no matter what, we are going to have buses."

Jacobs replied, "Well, that's the rumor."

On or about January 9, 1969, Casella went to certain law enforcement agencies, including the Federal Bureau of Investigation, hereinafter referred to as the F.B.I. After he had advised the F.B.I. of his difficulty in obtaining transportation, the F.B.I. undertook an investigation of the matter to see if there was evidence of a violation of 18 U.S.C. § 1951.

Arrangements were made for Special Agent Joseph Yablonsky to pose as Casella's sponsor, under the name of "Joe Wexler," from New York.

On January 22 or 23, 1969, Casella and his wife again went to see Kastenbaum at the latter's office. Casella told Kastenbaum he was using Metro buses and that Metro had stopped furnishing him with buses on January 13, 1969, and that he was then inoperative; that they had come back to see Kastenbaum to see if he could help them. Kastenbaum again told Casella he was "fighting a giant," he was "fighting the Greyhound Corporation," and that to secure a permit

to operate buses was almost an impossibility; that he "would have to see people."

Casella then said, "I now have a backer who is willing to back me up, and the last time I was here and spoke to you, you had told me it would cost $10,000 to get a permit." Kastenbaum replied, "I don't remember saying anything like that." Casella said, "I am sure you said that to me." Kastenbaum then turned to Mrs. Casella and said "Mrs. Casella, you were here. Did I say anything like that." She replied, "Yes, you did." Casella then implored Kastenbaum to help him. Kastenbaum said, "See Norman. I'll call him and tell him the situation and you talk to him."

Casella was then wearing a tape recorder, placed on him by a representative of the F.B.I.

Casella went to the office of Jacobs on January 23, 1969, and asked him whether he had had a call from Kastenbaum. Jacobs said, "No." Casella then said, "I went to see him, * * * I asked him for help, and he told me to see you." Jacobs said, "Well, let me call him and then I'll get back to you." Casella said, "I have a backer now who is going to back me up to get a permit." Jacobs said, "Well, I can't say anything. Let me call and see what the story is and then I'll get back to you."

On January 25, 1969, Casella saw Jacobs and asked him whether he had seen Kastenbaum. Jacobs said, "I was just down to the courtroom and Kastenbaum was there and I saw the fellow, and the fellow really has a pull down here with the councilmen." Casella asked, "Who, Kastenbaum?" Jacobs replied, "No, another fellow. But he was in court and he couldn't talk to me, and as soon as I get a chance to talk to him I'll get back to you."

On February 4, 1969, Casella found a note on the floor in his office, which caused him to get in touch with Jacobs. Casella telephoned Jacobs and asked him what was up. Jacobs replied, "Okay, we're going to get the permit," and said

it would cost Casella $50,000. Casella asked, "How is this going to work?" Jacobs said, "Well, you get the $50,000, and we will get a safety deposit box and we'll put it in there and we'll take the keys and we'll go over and I'll give it to him." Casella said, "Who's him? Is that Kastenbaum?" Jacobs said, "Yes. We'll go over and give it to him and then he'll go to the safety deposit box and get it."

Jacobs told Casella they would first get a state bus license and then the city would have to give him a Miami Beach bus license.

On the afternoon of February 12, 1969, Casella, accompanied by Jacobs, met Kastenbaum at the latter's office. Casella had had a tape recorder placed on his person. Jacobs told Kastenbaum that he met Casella's friend, that he had the money, and that the money would be placed in a safety deposit box. Kastenbaum said that he didn't even want to see the money and that Jacobs could hold it. He further stated that the money had to be put up in cash, all of it, not just part of it, and that the money would be refunded if Casella did not get the permit. Kastenbaum then made a call and arranged for a deposit box to be opened in the name of "Ray and Norman Corporation."

On the afternoon of February 13, 1969, Special Agent Yablonsky, going under the name of "Joe Wexler," Casella and Jacobs went to the Mercantile National Bank. Casella and Jacobs rented a safety deposit box and went into a room. Jacobs and Casella each signed a written sheet, usually required of persons who rent a safety deposit box. The bank gave Jacobs a key to the box and also gave Casella a key to the box. Casella gave his key to F.B.I. Agent Ralph Hill.

On February 17, 1969, Casella, F.B.I. Agent Yablonsky, and Jacobs went to the bank. Jacobs and Casella signed a written sheet, required by banks when a safety deposit box is opened. Yablonsky signed "Joe Wexler" on the back of the sheet. All three went into a private room and Yablonsky opened a brief case he

was carrying and took therefrom $50,000 in $100 bills and placed the bills on a table beside the box. Jacobs counted the money and was satisfied that the bills totaled $50,000. Yablonsky asked Jacobs who was the main councilman who had to be reached. Jacobs said, "Englander." Yablonsky said, "I hear that Mayor Dermer is a pretty straight man, * * *." Jacobs said "He is as bad as the rest of them." The money was put in the box and it was returned to its place in the safety deposit vault.

On February 18, 1969, with a recorder on his person, Casella met with Kastenbaum and Jacobs at the latter's office. Kastenbaum stated he understood the package had been delivered. Jacobs replied that the package was delivered.

The $50,000 was provided to Yablonsky by a Special Agent of the Florida Bureau of Law Enforcement. The record is not entirely clear, but it is apparent that the money was removed by the F.B.I. Agents by a warrant or subpoena shortly after it was counted by Jacobs and placed in the safety deposit box. As stated above by Jacobs, two permits were involved—one from the state to operate buses and one from Miami Beach to operate night club tours.

On February 25, 1969, Casella, with a recorder on his person, met with Kastenbaum at the latter's office. They went over the types of buses, colors, etc., to be used, and Kastenbaum again discussed what the name should be. Kastenbaum was recorded on the tape that was introduced in evidence as saying, "You just don't call up a Councilman. You have to make an appointment, discuss the matter with him and then you have to spread it out in order to make sure that you get whatever you are after."

On February 27, 1969, Casella, with a recorder on his person, accompanied by Yablonsky, met with Kastenbaum at the latter's office. Among other things said, Yablonsky asked Kastenbaum whether it was difficult to obtain such a permit and Kastenbaum told him it was impossible "without a good attorney and a good fee."

On March 5, 1969, Casella attended a meeting of the Miami Beach City Council. An application for Casella's permit or license to operate buses in Miami Beach was presented to the Council by Kastenbaum and the Council voted unanimously to grant the permit. However, Casella never received the permit.

■ The essence of a criminal conspiracy is the agreement or confederation by two or more persons to commit a crime, and an overt act done by one or more of the conspirators in furtherance of the object thereof.[8]

■ The offense of conspiracy is complete when the criminal agreement has been entered into and at least one overt act has been performed in furtherance thereof. However, a conspiracy does not necessarily end with the completion of the first overt act. It may be a continuing conspiracy and the parties may continue to commit overt acts in furtherance thereof.[9]

Conspiracy and the substantive offense which is the object thereof are separate offenses,[10] and although the substantive offense is committed, the con-

8. Hanford v. United States, 4 Cir., 231 F.2d 661, 662; Roberts v. United States, 5 Cir., 416 F.2d 1216, 1220; Castro v. United States, 5 Cir., 296 F.2d 540, 542; Romontio v. United States, 10 Cir., 400 F.2d 618, 619; Carlson v. United States, 10 Cir., 249 F.2d 85, 88; Colosacco v. United States, 10 Cir., 196 F.2d 165, 168; Oliver v. United States, 10 Cir., 121 F.2d 245, 249.

9. Pinkerton v. United States, 5 Cir., 151 F.2d 499, 501; Poliafico v. United States, 6 Cir., 237 F.2d 97, 106; Brady v. United States, 8 Cir., 24 F.2d 405, 407; Carbo v. United States, 9 Cir., 314 F.2d 718, 747.

10. Callanan v. United States, 364 U.S. 587, 593, 81 S.Ct. 321, 5 L.Ed.2d 312.

spiracy is not merged into the substantive offense.[11]

■ If there be an agreement or confederation between two or more persons to commit an unlawful act and one or more acts are done by one or more of the coconspirators, it is immaterial whether the substantive offense is or is not consummated.[12]

Whether the conspiracy charged came into existence when Jacobs telephoned Kastenbaum and made an appointment with Kastenbaum for Casella to see him and endeavor to arrange for Kastenbaum's assistance in obtaining transportation shortly after the middle of December 1968 is not definitely established, but it is clear from the evidence that Jacobs then fully knew that Casella was having great difficulty in obtaining transportation for his tour patrons and was in a desperate situation and would be likely to submit readily to extortion. Kastenbaum learned that the first time Casella met with him, because at that time Casella explained in detail his difficulties in endeavoring to obtain and keep transportation.

It is perfectly clear that the conspiracy came into being between Jacobs and Kastenbaum not later than when Jacobs talked to Kastenbaum shortly after Casella had gone to see Kastenbaum and informed him that he had a financial backer to provide money for obtaining the permit, and that Jacobs thereafter was a member of the conspiracy and was very active in endeavoring to accomplish the extortion until at least the latter part of February 1969.

It is immaterial that prior to the time Casella went to Kastenbaum's office, he had obtained the intervention of the F.B.I. in the matter, and that the extortion could no longer be accomplished nor

additional fear be engendered in the mind of Casella than had already taken place.

Not knowing that the F.B.I. was investigating the matter, and that they could not engender more fear in the mind of Casella then they had before the F.B.I. intervened, they continued to attempt to extort $50,000 from Casella, as the term "extort" is defined in the Act, and the conspiracy continued until the end of February 1969.

■ Indeed, it was not necessary that they attempted to extort money or property from Casella by the use of "actual or threatened * * * fear." It was sufficient to establish the conspiracy count that the Government prove that Kastenbaum and Jacobs conspired or confederated together to do so, and did some acts in the furtherance of the object of such conspiracy. Success or failure to establish a substantive offense, although the efforts continue over a substantial period of time, is not an element of a conspiracy offense and is therefore immaterial.

■ The proof of what Kastenbaum and Jacobs did in their attempt to extort $50,000 from Casella was material, so far as the conspiracy count was concerned, to prove the formation of the conspiracy and the continuation thereof, and not to establish the commission of the substantive offense. As to the second count, it was material to establish the substantive offense.

There is ample evidence that Casella advertised his bus tours at Miami Beach and in many states other than the State of Florida; that in the short time he operated his tours persons from several states other than Florida took the tours, and that the acts of Jacobs and Kastenbaum in endeavoring to further the

11. Callanan v. United States, 364 U.S. 587, 590, 81 S.Ct. 321, 5 L.Ed.2d 312; Valdez v. United States, 5 Cir., 249 F.2d 539, 541; Woods v. United States, 99 U.S.App. D.C. 351, 240 F.2d 37, 40; Doherty v. United States, 10 Cir., 193 F.2d 487, 488; Sneed v. United States, 5 Cir., 298 F.

911, 913; Carbo v. United States, 9 Cir., 314 F.2d 718, 733.

12. Beitel v. United States, 5 Cir., 306 F.2d 665, 670; Hanford v. United States, 4 Cir., 231 F.2d 661, 662; United States v. Bayer, 331 U.S. 532, 542, 67 S.Ct. 1394, 91 L.Ed. 1654.

object of the conspiracy obstructed, delayed, or affected interstate commerce.

The $50,000 to be paid to Kastenbaum for securing the permit was not a contingent fee. A charge of that amount to secure a permit by legitimate means would be highly exorbitant, indeed preposterous. It plainly appears from Kastenbaum's own statements, the first time he was consulted by Casella, and at further meetings between Casella and Kastenbaum and between Casella and Jacobs, after Jacobs was a member of the conspiracy, that at least a substantial part of the $50,000 was going to be used to secure favorable action by the public officials.

For example, the first time that Kastenbaum talked to Casella and the amount of $10,000 was discussed, he told Casella, "You have to have an attorney with a good fee. You can't go to a councilman and offer him $100. You have to give him at least $1,000 or $1,500 * * *."

We shall next consider whether the court erred in admitting the tape recordings of pertinent conversations between Casella and Kastenbaum and Casella and Jacobs.

There was no unlawful physical invasion of the premises of either Kastenbaum or Jacobs, under circumstances that would violate the Fourth Amendment. The tape recordings of the conversations were made in order to obtain the most reliable evidence possible of such conversations, and they were conversations that Casella was entitled to disclose and testify to at the trial.

The fact that Casella and the F.B.I. Agents did not intend to pay the $50,-000 to Kastenbaum did not make such conversations constitutionally protected.

Certain of the tape recordings made were not offered in evidence, because they were unintelligible, due to outside noises or for other reasons. The tape recorder was placed on Casella by F.B.I. Agent Benjamin P. Grogan. After a conversation was recorded, Grogan took the tape recorder and the tape of the conversation made on it and retained custody of the tape recording. There were no alterations, deletions, or additions to the recordings. Some that were unintelligible, because of outside noises or other interference, were not offered in evidence.

Grogan made transcripts of the tape recordings that were introduced. He knew the voices of the persons who participated in the recorded conversations. On the transcripts, he identified the persons speaking by letters preceding what such person said each time he spoke. He explained which person each letter stood for. For example, Kastenbaum was indicated by the letter "K". He repeated what the letters stood for when asked to do so by some of the jurors.

The tapes were received in evidence and were played at the trial to the jury and to each of the counsel for the parties and to the parties themselves. Each juror was provided with a transcript of each tape while it was being played, in order for him to identify the speaker making a recorded statement.

However, before the tape recordings were played, the court very clearly instructed the jurors that the transcripts were to be used by each juror to enable him to identify the person speaking, whose statement was being reproduced by the recorded tapes when played and for no other purpose, and that the only evidence the jurors could consider was that reflected by the tape recordings themselves, and not by anything in the transcripts. The jurors surrendered the transcript of each tape recording when the playing of such recording was completed.

Counsel for Jacobs and Kastenbaum were permitted to hear the tape recordings with their clients, to examine the transcripts, and to use them while the tape recordings were being played, prior to the trial.

We conclude that the court followed the proper procedure, properly instructed the jury, and properly admitted the recordings in evidence. It is

self-evident that a tape recording would be more accurate than the recollection of a witness a year or more after the conversation had occurred.

We think this conclusion is fully supported by the decision of the United States Supreme Court in Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462.[13]

■ The court limited the number of character witnesses to be introduced by each defendant to three. By doing so, we do not think he abused his discretion.

The other claims of error set up by Jacobs and Kastenbaum in their respective briefs are, in our opinion, wholly without merit and do not warrant extended consideration.

Since both defendants were convicted on Count I, and the sentence on Count II was to run concurrently with the sentence on Count I, we find it unnecessary to give consideration to the validity of the conviction of Kastenbaum on the second count. See cases cited in Note 3, supra.

The judgments are affirmed.

ON PETITIONS FOR REHEARING AND PETITIONS FOR REHEARING EN BANC

PER CURIAM:

■ In connection with the Petitions for Rehearing for each of the Appellants, the Court adds the following to its opinion. The word "fear" as it is used in the definition of extortion in subsection (b)(2) of 18 U.S.C.A. § 1951 reading "the term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened * * * fear * * *" embraces fear of economic loss. United States v. Iozzi, 4 Cir., 1970, 420 F.2d 512, cert. denied, 1971, 402 U.S. 943, 91 S.Ct. 1607, 29 L.Ed.2d 111. See also United States v. Tropiano, 2 Cir., 1969, 418 F.2d 1069, cert. denied, 1970, 397 U.S. 1021,

90 S.Ct. 1258, 25 L.Ed.2d 530, and United States v. Sweeney, 3 Cir., 1959, 262 F.2d 272. The Petitions for Rehearing filed on behalf of Norman Jacobs and George Kastenbaum are each denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petitions for Rehearing En Banc are each denied.

---

13. See also, Baker v. United States, 139 U.S.App.D.C. 126, 430 F.2d 499, 503

(1970); United States v. Perlman, 7 Cir., 430 F.2d 22, 26 (1970).