**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Herbert MIKELBERG and Anthony F. Caterine, Defendants-Appellants.**

**No. 74–2518.**

United States Court of Appeals,
Fifth Circuit.

Aug. 11, 1975.

Rehearing and Rehearing En Banc
Denied Oct. 3, 1975.

John H. Marks, Jr., Dallas, Tex. (Court appointed), for Herbert Mikelberg.

Arthur Mitchell, Austin, Tex., for Anthony F. Caterine.

Frank D. McCown, U. S. Atty., Roger J. Allen, Asst. U. S. Atty., Ft. Worth, Tex., Charles D. Cabaniss, Wm. F. Sanderson, Jr., Asst. U. S. Attys., Dallas, Tex., for plaintiff-appellee.

Before THORNBERRY, COLEMAN and ROSENN,* Circuit Judges.

COLEMAN, Circuit Judge.

In 1970, as a part of an extensive Act dealing with federal deposit insurance, the maintenance of bank records, the report of certain currency transactions, "and for other purposes", the Congress legislated with reference to credit cards, now 15 U.S.C., § 1644, as follows:

> "§ 1644. Fraudulent use of credit card

> "Whoever, in a transaction affecting interstate or foreign commerce, uses any counterfeit, fictitious, altered, forged, lost, stolen, or fraudulently obtained credit card to obtain goods or services, or both, having a retail value aggregating $5,000 or more, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

It will be noted that the statute uses both words, "transaction" and "card", in the singular.

The sparse legislative history is found in a six line portion of the conference report, U.S.Code Congressional and Administrative News 1970, 91st Congress, Second Session, II, p. 4414:

> "Credit Cards

> "Title V—Provisions Relating to Credit Cards

> "The Senate bill attached a new title V (amending the Truth-in-Lending Act) regulating the issuance of credit cards, creating liability for the unauthorized use of credit cards, and providing criminal penalties for certain unauthorized uses. The House agreed to the Senate language with an amendment limiting criminal penalties for use of illegally obtained cards to cases involving amounts of $5,000 or more."

The conference report thus emphasizes that criminal penalties for the unauthorized use of credit cards are limited "to *cases* (emphasis ours) involving amounts of $5,000 or more".

* Of the Third Circuit, sitting by designation.

The legislation is so new that we have been unable to find a single appellate decision defining the meaning of "a transaction" as used in the Act.[1]

The appellants presently before us were indicted and convicted under the terms of the original statute. In 1974, Congress extensively amended § 1644.[2]

The alleged conduct of the appellants clearly falls within the terms of the amended statute, but we confront the question of whether it was covered by the 1970 Act since no single interstate transaction of theirs involved as much as five thousand dollars.

## I

### The Substantive Counts

On February 12, 1974, along with Lester Ray Henderson and William Allen Davis who are not involved in this appeal, Caterine and Mikelberg were indicted in the United States District Court for the Northern District of Texas in a nine page, four count indictment. The first count was for conspiracy to violate § 1644, the remaining three counts for substantive violations of the statute. Count II disappeared from the case. The defendants were convicted on Counts I, III, and IV.

We state the substantive counts first.

Count III charged that *from* on or about December 1, 1971, through February 29, 1972, Caterine, Mikelberg, and Henderson did, in *a* (emphasis ours) transaction affecting interstate commerce, use a fraudulently obtained American Express card issued in the name of Richard Pittman to obtain goods and services having an *aggregate* (emphasis ours) retail value in excess of five thousand dollars, in violation of Title 15, United States Code, § 1644, and Title 18, United States Code, § 2.

Count IV charged that from January 1, 1972 to March 31, 1972, Caterine, Mik-

---

1. The Supreme Court noted the existence of the statute in United States v. Maze, 414 U.S. 395, 94 S.Ct. 645, 650, 38 L.Ed.2d 603, and we did the same in United States v. Green, 5 Cir., 1964, 494 F.2d 820, 826, but these were mail fraud prosecutions, 18 U.S.C., § 1341, and neither the Supreme Court nor our Court attempted any discussion of § 1644. Such discussion would, of course, have been dicta.

2. "134. Fraudulent use of credit card

"(a) Whoever knowingly in a transaction affecting interstate or foreign commerce, uses or attempts or conspires to use any counterfeit, fictitious, altered, forged, lost, stolen, or fraudulently obtained credit card to obtain money, goods, services, or anything else of value which within any one year period has a value aggregating $1,000 or more; or

"(b) Whoever, with unlawful or fraudulent intent, transports or attempts or conspires to transport in interstate or foreign commerce a counterfeit, fictitious, altered, forged, lost, stolen, or fraudulently obtained credit card knowing the same to be counterfeit, fictitious, altered, forged, lost, stolen, or fraudulently obtained; or

"(c) Whoever, with unlawful or fraudulent intent, uses any instrumentality of interstate or foreign commerce to sell or transport a counterfeit, fictitious, altered, forged, lost, stolen, or fraudulently obtained credit card knowing the same to be counterfeit, ficti-

tious, altered, forged, lost, stolen, or fraudulently obtained; or

"(d) Whoever knowingly receives, conceals, uses, or transports money, goods, services, or anything else of value (except tickets for interstate or foreign transportation) which (1) within any one-year period has a value aggregating $1,000 or more, (2) has moved in or is part of, or which constitutes interstate or foreign commerce, and (3) has been obtained with a counterfeit, fictitious, altered, forged, lost, stolen, or fraudulently obtained credit card; or

"(e) Who knowingly receives, conceals, uses, sells, or transports in interstate or foreign commerce one or more tickets for interstate or foreign transportation, which (1) within any one-year period have a value aggregating $500 or more, and (2) have been purchased or obtained with one or more counterfeit, fictitious, altered, forged, lost, stolen, or fraudulently obtained credit cards; or

"(f) Whoever in a transaction affecting interstate or foreign commerce furnishes money, property, services, or anything else of value, which within any one-year period has a value aggregating $1,000 or more, through the use of any counterfeit, fictitious, altered, forged, lost, stolen, or fraudulently obtained credit card knowing the same to be counterfeit, fictitious, altered, forged, lost, stolen, or fraudulently obtained—shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

elberg, and William A. Davis committed the same offense, using an American Express card issued to William A. Davis.

## II

### The Conspiracy Count

#### [Count I]

This count charged that from September 1, 1971 to May 1, 1972, Caterine, Mikelberg, Henderson, William A. Davis, and unindicted co-conspirators Rita Kenner and Richard Payne, committed a highly detailed conspiracy (thirty overt acts) to use fraudulently obtained credit cards issued by American Express and other companies. The various overt acts all involved airline tickets. No averment appeared in the count as to the value of any airline ticket but obviously none of them individually amounted to as much as five thousand dollars.

## III

### The Underlying Facts

The record clearly reveals an organized scheme to make fraudulent applications for and thereafter to use credit cards for the purchase of goods which could be sold for cash.

The proof for the government depended primarily on the testimony of the co-defendants William A. Davis[3] and Lester Ray Henderson.[4]

The evidence showed that these two, along with the appellants, conspired with Richard William Payne,[5] Richard Green,[6] and Rita Carpenter Green[7] to make the fraudulent credit card applications. Davis, Henderson, and Payne made the applications. They operated a bartending school, would give the school as a reference, thereby verifying employment and credit information for each other.

Using both real and assumed names, applications were made to American Express, Diner's Club, Carte Blanche, TWA, American Airlines, and others. Fre-

quently, several cards were obtained from the same company.

Occasionally, the group bought and sold automobile tires, but they specialized in airplane tickets, which they resold for *half price*. Henderson testified that another use of the cards was the making of a "split ticket", such as, for example, a charge for a three dollar cocktail at Caterine's club would be accompanied by a ninety-seven dollar tip. He and Caterine would then divide the ninety-seven. The aggregate amount of the charges accomplished by this scheme reaches into the hundreds of thousands of dollars.

During the period in question, Caterine owned and operated a nightclub in Dallas known as the Losers Club. He also owned and operated T. C. Management Corporation, a booking agency for entertainers. Because transportation is frequently included in an engagement, Caterine gave many of the airline tickets (traceable to him) to entertainers whom he had booked all over the country.

Mikelberg apparently worked for Caterine, and at one point managed a clothing store for him.

Mrs. Kathleen Parish, a former bartender at the Losers Club, testified that in August, 1971, she overheard a conversation in the Losers Club between Lester Ray Henderson, Richard Payne, and both appellants. The group was discussing the use of credit cards, and how they could be used to acquire merchandise without paying for it. More specifically, they were discussing buying large quantities of tires.

She further testified to hearing Mikelberg tell this same group of a plan to obtain ten American Express, ten Carte Blanche, and ten Diner's Club credit cards. He would then charge $10,000 worth of airline tickets on each card. Thereafter, he would take one card and its accompanying vouchers to each of the three issuing companies. By showing the companies a computer program.

---

3. Also known as William C. Tucker.

4. Also known as Clinton R. Pittman.

5. Also known as Richard Kenner.

6. Also known as Richard Traylor.

7. Also known as Rita Payne, Rita Kenner, or Kay Kenner.

which would prevent similar multiple charges in one day's time he hoped they would pay him to install the system. This plan was known to the participants as the "Mikelberg Special".

The record is replete with examples of each appellant giving tickets away and buying them at half price from one of the other co-conspirators. Martin Pinchinson, a former employee of Caterine's booking agency, once asked Caterine the source of a ticket Caterine gave him. Caterine replied that it was legal, that someone owed him money. On a similar occasion, Barbara Braswell, a former cashier at the Losers Club, asked Caterine why the amount on a credit card charge (she couldn't remember if it was for Payne or Henderson) was left blank. Caterine replied that it involved "a loan or some money". Lester Ray Henderson testified that he bought several tickets for Caterine at Caterine's request. He charged them on various credit cards, and was paid half their face value by Caterine. In addition, Henderson testified that Caterine allowed him to list his businesses as references when applying for credit cards. According to Henderson, Caterine made his "black list" of suspended credit cards, issued by the respective companies, available to him on request.

W. D. Gillham, a former bartender at the Losers Club, testified that Caterine once told him he had airline tickets available, and to let him know if he ever needed any. Frank Joiner, a talent agent, testified that Mikelberg told him he could get tickets at half price, and that he subsequently got tickets from Mikelberg for half their face value.

## IV

### The Issues

The respective appeals on behalf of Caterine and Mikelberg closely parallel each other.

1. Did the evidence show a transaction within the terms of 15 U.S.C., § 1644, that is, *a transaction* wherein fraudulently obtained credit cards were used to obtain goods or services having a retail value aggregating $5,000 or more?

The District Court instructed the jury:

"The term 'a transaction' as used in the second element of the alleged offense does not mean a single sales event. The term 'transaction' may include more than one purchase or charge so long as there is a common scheme or design behind those purchases or charges. If there is proved beyond a reasonable doubt a common scheme or design with respect to the use of a fraudulently obtained credit card, then numerous purchases or charges can be linked to constitute a 'transaction' for so long as such common scheme or design exists."

The correctness of this instruction is the critical issue in the case, particularly that part of it which told the jury that "*numerous* purchases or charges" might be linked to constitute "*a* transaction" (emphasis ours).

Congress must have known that very few charges amounting to five thousand dollars or more were likely to be made at one time or place, i. e., in a single transaction, against a credit card. Nevertheless, it chose to use "transaction" *in the singular*, rather than the plural. Having done this, it also used "credit card" in the singular, followed by goods and services in the same manner but it concluded by allowing the requisite sum to be reached by aggregation.

■ Due process dictates that men of common intelligence cannot be required to guess at the meaning of a penal enactment. The decisions of the Supreme Court have never left any doubt about this principle.[8]

8. Winters v. People of the State of New York, 333 U.S. 507, 68 S.Ct. 665, 91 L.Ed. 840 (1948); Watkins v. United States, 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957); United States v. Harris, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954); Cramp v. Board of Public Instruction of Orange County, Florida, 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961); United States v. Sullivan, 332 U.S. 689, 68 S.Ct. 331, 92 L.Ed. 297 (1948), and many others.

The requirements as to a *new* statute such as we have here are no less exacting. A case which promptly comes to mind is Lanzetta v. State of New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939). Under a recently enacted New Jersey statute, Lanzetta was convicted of being a gangster. In reversing the conviction the Supreme Court said:

> "It is the statute, not the accusation under it, that prescribes the rule to govern conduct and warns against transgression. No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids. The applicable rule· is 'That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties * * * and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law'." [Emphasis added and Supreme Court citations of authority omitted].

We have only recently held that "Courts are compelled to construe [criminal statutes] rigorously in order to protect unsuspecting citizens from being ensnared by ambiguous statutory language", United Sates v. Insco, 5 Cir., 1974, 496 F.2d 204, a case involving the issue of whether campaign bumper stickers were included within the terms of a criminal statute. We held that the defendant could not be held to have had notice that the conduct in question was within the statutory terms. We concluded that "where freedom is at stake, ambiguities and doubts as to statutory application must be resolved in favor of the accused".

As authority we cited the language of the Supreme Court in United States v. Enmons, 410 U.S. 396, 93 S.Ct. 1007, 1015, 35 L.Ed.2d 379 (1973):

> "First, this being a criminal statute, it must be strictly construed, and any ambiguity must be resolved in favor of lenity."

We also cited Rewis v. United States, 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971), in which the Supreme Court reversed our affirmance of a conviction of defendants who conducted a lottery near a state line, whose customers traveled in interstate commerce to reach their place of business, but who did not themselves so travel, 18 U.S.C., § 1952. There, again, the Court said "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity", citing Bell v. United States, 349 U.S. 81, 83, 75 S.Ct. 620, 99 L.Ed. 905 (1955).

These are the considerations in favor of the defendants, but this is not the end of the matter.

There is no room for doubt that Congress meant to prohibit, and the statute plainly forbids, the interstate use of fraudulently obtained credit cards in a transaction to obtain goods or services, or both, having a retail value aggregating $5,000 or more. As to all this there is nothing either vague or indefinite. The problem narrows to the perimeters of "a transaction". Under this statute, did the District Court correctly instruct the jury in that regard?

The Supreme Court appears to have partially answered the question in Moore v. New York Cotton Exchange, 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926) when it wrote:

> " 'Transaction' is a word of flexible meaning. It *may* (emphasis ours) comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship."

Congress, in its effort to attack fraudulent abuse of credit cards, was concerned for jurisdictional purposes that the credit card transaction affect interstate or foreign commerce and that the goods obtained have "a retail value aggregating $5,000 or more". As reasonable individuals familiar with credit card transactions, we must assume that

Congress knew that a single transaction by credit card would rarely exceed $5,000.

■ On the other hand, Congress was concerned that federal courts not be involved in frauds involving small amounts that might be handled readily in the state courts. The anomaly, however, is the preliminary phrase "in a transaction". To give it consistency with the rest of the sentence and provide meaning to the statute, we conclude that Congress intended to confine the aggregating of purchases only to those purchases made "in a transaction affecting interstate or foreign commerce". In other words, it was excluding any transaction in intrastate commerce. Limiting the statute to a single transaction aggregating $5,000 in purchases pragmatically would render the statute useless. "A basic principle of statutory construction enjoins us from imputing to the Legislature an intent to produce an absurd result", Government of the Virgin Islands v. Hernandez, 3 Cir., 1975, 508 F.2d 712, citing Yankee Network, Inc. v. Federal Communications Commission, 1939, 71 U.S.App.D.C. 11, 107 F.2d 212, 219 and n. 34.

Additionally, we must take into consideration the provisions of 1 U.S.C., § 1.

"In determining the meaning of any Act of Congress, unless the context indicates otherwise—words employing the singular include and apply to several persons, parties, or things . . . ."

Under the foregoing statutory rule of construction, the problem of whether the word "transaction" should be given a singular or plural meaning disappears. We are free to construe "in a transaction" in the fraudulent credit card statute in the plural as well as the singular, especially since a plural construction is the only way of giving the statute meaning. The statutory construction act in 1 U.S.C., § 1 has been construed by the Supreme Court and approved. See Barr v. United States, 324 U.S. 83, 65 S.Ct. 522, 89 L.Ed. 765 (1944), wherein the statute under construction in that case addressed itself to a singular rather than a plural "buying rate".

The strong presumptive validity that attaches to an act of Congress has led the Supreme Court to hold many times that statutes are not automatically invalidated as vague "simply because difficulty is found in determining whether certain marginal offenses fall within their language. Indeed, we have consistently sought an interpretation which supports the constitutionality of legislation", United States v. National Dairy, 372 U.S. 29, 32, 83 S.Ct. 594, 597, 9 L.Ed.2d 561 (1962) (citations omitted). In Bell v. United States, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955), the Supreme Court pointed out that the rule of lenity in the construction of a penal code "in no wise implies that language used in criminal statutes should not be read with a saving grace of common sense with which other enactments, not cast in technical language are to be read. Nor does it assume that offenders against the law carefully read the penal code before they embark on crime".

■ On this line of reasoning, we are not prepared to hold erroneous the statutory construction embodied in the instructions of the Court. We decline to reverse on those grounds.

### Issue No. 2

■ Under a wealth of authority too well known to require repetition, we hold that the evidence was sufficient to support convictions for conspiracy and for aiding and abetting. See Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1941); Lopez v. United States, 5 Cir., 1969, 414 F.2d 909; Mosheim v. United States, 5 Cir., 1960, 285 F.2d 949, 952, cert. denied 365 U.S. 868, 81 S.Ct. 903, 5 L.Ed.2d 859; Rodriquez v. United States, 5 Cir., 1967, 373 F.2d 17; Surrett v. United States, 5 Cir., 1970, 421 F.2d 403.

As to the conspiracy count, the jury had before it testimony indicating that during the period in question both Caterine and Mikelberg were buying airplane

tickets for half their face value from Davis, Henderson, and Payne; that Lester Ray Henderson was applying for credit cards under aliases; that Caterine agreed to make available to Henderson credit card black lists; that Caterine gave Henderson names of people for whom he needed tickets; Mrs. Parish's testimony that she overheard a general discussion between Henderson, Payne, and appellants concerning running up excessive charges on credit cards with no intention of paying for the goods received; and, last, knowledge of the "Mikelberg Special".

As to Counts III and IV, which allege substantive violations, appellants' involvement is imputed to them by 18 U.S.C., § 2, which assigns the status of principal to anyone who wilfully causes the commission of an act against the United States. Both counts charge using a fraudulently obtained American Express card, one in the name of Lester Ray Henderson (Count III), and the other in the name of William A. Davis (Count IV).

Lester Ray Henderson testified that Mikelberg accompanied him to a bank to open a checking account, that he frequently bought tickets at Caterine's request in the names of Caterine's associates, and that Caterine would cash "split tickets" for him at the Losers Club. He testified that he sold Caterine liquor (which he had charged on an American Express card) at a 30% discount, and that he once sold appellants the airplane tickets at a 50% discount. Caterine and Mikelberg were the beneficiaries of almost every charge which Henderson made.

Count IV charged the same as Count III, except that it was William Davis who was allegedly aided.

Davis testified that he applied for the credit cards in question, and that some information on these cards was false. Most of the charges shown were for airplane tickets which were turned over to Henderson. He testified that he met Mikelberg in Atlanta, and discussed the purchasing of tickets with him and Henderson. He testified that he was given a list of names prepared by Mikelberg for whom to buy tickets. He did testify that he had only met Caterine once, and that was a brief exchange of pleasantries in a parking lot.

However, an important factor is that Davis knew everyone else involved in this case, and apparently participated to the fullest extent in all activities. He was a co-founder of the bartenders' school which was listed on all credit card applications as a reference and place of employment. What he did for one was of assistance to all.

One final point, Mikelberg and Caterine did not personally obtain the credit cards, but there was sufficient evidence in the record to support a jury finding that they knew the cards were fraudulently obtained.

### Issue No. 3

Appellants next contend that assuming a transaction is found, there remains a question of *fact* for the jury to determine whether interstate commerce was affected. They therefore object to the Court's instruction:

"The fourth element necessary to be proved is that the transaction, if any, was one that affected interstate commerce. This is an issue of law for the court to determine. Whether a transaction did in fact occur is, however, an issue of fact to be determined by the jury in responding to the second element of the alleged offense. If you find beyond a reasonable doubt that the second element has been proved by the government, then such a transaction, if believed, affected interstate commerce and the fourth element is satisfied."

■ We have found no criminal case which addresses this point. Even if the point was for the jury to decide, the giving of this instruction was harmless error beyond a reasonable doubt. Applications were mailed to the card companies, most of the charges involved interstate airplane tickets, and the record is

replete with examples of a member of the group traveling from state to state to purchase tickets. Even if the jury had been allowed to decide, the same result would have been imperative. For it to have found otherwise would be inconceivable.

### Issue No. 4

As a final point, appellants have filed a supplemental brief which points out that 15 U.S.C., § 1644 was amended by Congress in October, 1974. They argue that this amendment does not contain a clause saving all prosecutions pending at the time of amendment, and urge us to dismiss the case because the conviction was not final as of the date of the amendment.

The alleged violations of 15 U.S.C., § 1644 with which Caterine and Mikelberg are charged took place during 1970 and 1971. Appellants were indicted February 21, 1974, and convicted April 30, 1974. The statute was amended in October, 1974. Title 1 U.S.C., § 109 provides:

"The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability."

See, also, United States v. Brown, 5 Cir., 1970, 429 F.2d 566, 568.

The remaining assignments of error do not merit discussion.

The convictions of both appellants are Affirmed.