**UNITED STATES of America**

v.

**Peter ADAMO et al.**

**Appeal of Vincent KEARNEY.**

**No. 75–1415.**

United States Court of Appeals, Third Circuit.

Argued Jan. 12, 1976.

Decided March 29, 1976.

---

Joseph A. Hayden, Jr., Newark, N. J., for appellant.

Jonathan L. Goldstein, U. S. Atty., Newark, N. J., for appellee; Maryanne T. Desmond, Asst. U. S. Atty., Newark, N. J., on the brief.

Before GIBBONS, HASTIE and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

The rapidly growing use of credit as a lifestyle in this nation forms the backdrop for a fraudulent credit card scheme allegedly involving sixteen co-conspirators in this criminal case. Vincent D. Kearney, Jr., appellant, was tried to a jury in the United States District Court for the District of New Jersey. He was convicted on all three counts of an indictment which charged him and others with (I) conspiracy to violate the federal mail fraud statutes under 18 U.S.C. § 371 (1971);[1] (II) use of the mails to defraud in violation of 18 U.S.C. §§ 1341 and 1342 (1971);[2] (III) use of false names

1. 18 U.S.C. § 371 provides in pertinent part:
   If two or more persons conspire either to commit any offense against the United States, or to defraud the United States . . . and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

2. 18 U.S.C. § 1341 provides in pertinent part:
   Whoever, having devised . . . any scheme or artifice to defraud, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service . . . shall be fined not

and addresses in violation of 18 U.S.C. § 1342.

After denial of his motion for a judgment of acquittal notwithstanding the verdict, or in the alternative, for a new trial, Kearney was sentenced to five years' imprisonment on each count, to run concurrently. His appeal to this court raises a number of grounds for reversal.

First, Kearney attacks the sufficiency of the indictment. Further, he contends that the Government failed to prove a violation of the federal mail fraud statutes, the existence of a single conspiracy as charged, or the execution of any of the overt acts contained in the conspiracy count of the indictment. Finally, Kearney claims that the Assistant United States Attorney commented impermissibly on his failure to testify. We have given these contentions careful consideration and find them without merit. We therefore affirm Kearney's conviction.

## I.

The evidence introduced by the Government established the existence of a credit card conspiracy lasting over two years and involving more than a dozen people. The ring operated out of the Alexander Hamilton Hotel in Paterson, New Jersey. Kearney not only used lost or stolen credit cards, but he also sold them to other co-conspirators along with false identification, such as drivers' licenses. Use of the credit cards was facilitated by semiweekly meetings at the hotel to exchange information regarding which stores to avoid and which cards had appeared on missing card lists issued by credit card companies and banks, and to pass on tips for continued safe use of the cards. Aside from frequent use of the cards to purchase food and drink at the hotel and at area restaurants, members of the group made a business of purchasing goods with the cards and selling the goods to Kearney and others at the hotel.

Particularly popular were women's shoes, purchased at a shoe store managed by Robert Largemann. Largemann also frequented the bar at the Alexander Hamilton Hotel, knew Kearney socially, and had met Adamo, a codefendant. Largemann honored credit cards offered by Kearney and others over the course of the conspiracy, knowing that they were not the card owners. Largemann was charged with complicity in the conspiracy and pleaded guilty to Count I of the indictment.

Other unindicted merchants in the area, particularly restaurateurs, knew Adamo and Kearney by name but nevertheless repeatedly accepted the proffered credit cards issued in names of other persons. The conspirators patronized the business establishments of these merchants regularly.

Of the sixteen indicted co-conspirators, four were brought to trial: Peter Adamo, Richard Hoy, Vincent Kearney, and Paul Lachmann, owner of the Alexander Hamilton Hotel. Only Lachmann presented evidence in his behalf. The jury found Lachmann not guilty and found the other three defendants guilty on all counts. The court entered a judgment of acquittal notwithstanding the verdict as to defendant Hoy. Adamo and Kearney appealed their convictions to this court. Since his appeal, Adamo has died and we have vacated the judgment as to him and directed the district court to dismiss the indictment against him.

## II.

■ The Government proceeded under the federal mail fraud statutes, rather than under 15 U.S.C. § 1644 (1971), which deals specifically with credit card fraud.[3] Fraud-

more than $1,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1342 provides in pertinent part: Whoever, for the purpose of conducting, promoting, or carrying on by means of the Postal Service, any scheme or device mentioned in section 1341 of this title . . . uses . . any fictitious, false, or assumed title, name, or

address or name other than his own proper name . . . shall be fined not more than $1,000 or imprisoned not more than five years, or both.

3. The credit card statute applies to fraud cases in which the value of goods and services fraudulently obtained totals $5,000 or more. *See*

ulent schemes involving credit cards generally may be prosecuted under federal mail fraud statutes because, after a credit card is used, the sales invoice is mailed to the bank or credit card company, which in turn uses the mails to send a bill to the credit card owner and payment to the merchant. The use of the mails thus necessarily resulting from a purchase by credit card is "caused" by the purchaser. *Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 362, 98 L.Ed. 435, 442 (1954).

Kearney claims that the indictment in the instant case is insufficient to charge a federal mail fraud offense, especially in light of the recent United States Supreme Court decision in *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974). That decision had a substantial impact upon prosecutions for credit card fraud under the mail fraud statutes as the *Maze* Court strictly construed the statutory language that use of the mails be "for the purpose of executing such scheme or artifice."

Kearney's argument is that the indictment does not specify the connection between the alleged fraudulent plan and the use of the mails. The district court, ruling on Kearney's pre-trial motion to dismiss the indictment, held that *Maze* was inapplicable to this case. We agree that *Maze* does not require dismissal of this indictment.

In *Maze*, the defendant charged lodgings and food at motels on a stolen credit card over the course of two weeks. Since his fraudulent plan was complete upon the honoring of the card by unknowing motel operators, the use of the mails routinely resulting from his purchases was held incidental to and not "for the purpose of executing" his plan. In fact, it was immaterial to *Maze* whether the invoices were ever mailed.

The determination that the mailings were insufficiently linked to the execution of the scheme had earlier been applied to reverse convictions under the federal mail fraud

statutes. *Parr v. United States*, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960); *Kann v. United States*, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944). The inquiry in each case attempted to pinpoint at what time the scheme was executed, the fraud completed.

In the instant case, two merchants were also charged with participation in the fraudulent scheme. Hence, the point at which this plan reached fruition was not at presentation of the credit cards but rather after the bank or credit card company had made mail payment in response to the mailing of the invoices.

The indictment charges [4] that the conspirators formulated a plan whereby they would ascertain the rightful owners of credit cards, Kearney and two others would furnish the cards to eleven other conspirators, they would assume the names of the true card owners, and then Kearney and thirteen others:

> would present said Diners Club, American Express, Bank Americard and Master Charge credit cards to defendants Robert D. Largemann and Paul Lachmann who would accept such cards for payment for merchandise knowing that the defendants presenting the said credit cards were not the owners of the credit cards
>
> . . .

To complete the plan, the indictment further charges that all the defendants would cause commercial establishments to mail letters and bills to banks and credit card companies and would cause the latter to mail letters and checks to the commercial establishments.

The indictment thus expressly includes two merchants who honored credit cards for purchases. Integral to their participation and thus to the execution of the fraudulent scheme as charged was the continuation of the routine mailings. Their reliance on the use of the mails for carrying out the scheme distinguishes this case from *Maze* so that

*United States v. Mikelberg*, 517 F.2d 246, 250–52 (5th Cir. 1975).

4. Count I fully sets out the parts of the plan, and Counts II and III incorporate that portion of Count I by reference.

the indictment sufficiently charges a federal mail fraud offense.

■ Kearney, in addition, attacks the indictment for failure to charge that the success of the scheme depended on the mailings. The simple answer to that claim is found in *United States v. Maze, supra*, 414 U.S., at 400, 94 S.Ct. at 648, 38 L.Ed.2d at 608. There the Court quotes from *Pereira v. United States, supra*, to the effect that the use of the mails need not itself be an essential element of the scheme. It is enough that the use of the mails merely furthers the scheme, as charged in the indictment in the instant case. The Government has no obligation to include in an indictment an allegation which is not an element of the offense charged. *See* Fed.R. Crim.P. 8(c).

■ The indictment survives another attack by Kearney. He contends that it fails to allege facts with sufficient specificity to apprise him of the nature of the charges against him. He cites *United States v. Curtis*, 506 F.2d 985 (10th Cir. 1974), in which the indictment did not clearly set forth the elements of the fraudulent scheme charged. The *Curtis* indictment was so vague that trial might have proceeded upon an entirely different concept of the scheme than that contemplated by the grand jury when it returned the indictment. By contrast, the indictment in this case explicitly outlines the elements of the fraudulent plan. *United States v. Cohen*, 516 F.2d 1358, 1366–67 (8th Cir. 1975). We therefore find Kearney's argument that he was not informed of the charges against him to be untenable.

We conclude that the indictment is sufficient to charge a federal mail fraud offense and that it does not suffer from the other deficiencies claimed by Kearney.

### III.

The sufficiency of the Government's evidence also falls under Kearney's critical eye. In our consideration of the challenges to its sufficiency, we must view the evidence in the light most favorable to the Government as the jury returned a guilty verdict against Kearney. *United States v. Kates*, 508 F.2d 308, 310 (3d Cir. 1975).

Proof of violation of the federal mail fraud statutes must be analyzed by the *Maze* standard requiring evidence that mailings be for the purpose of executing the scheme.

■ Although Kearney does not mention it, the fact that one indicted merchant, Lachmann, was acquitted by the jury somewhat weakens the Government's case that the conspiracy must have contemplated use of the mails because it involved merchants. However, the other indicted merchant, Largemann, pleaded guilty to the conspiracy count, and evidence of his participation establishes that use of the mails was part of the scheme.

The credit cards were used illegally over the course of about two years at the store which Largemann managed. As he testified, he did not wish to defraud the shoe company but simply wanted "to build up the company, the store itself" after the riots in Paterson had severely depressed shopping in the area. It is thus apparent that neither Largemann nor the shoe company was a victim of the fraud. Indeed, Largemann's participation in the scheme would doubtless have come to an abrupt halt had the routine mailings of invoices and reimbursements to the shoe company been disturbed.

The mailings to the banks or credit card companies were essential to Largemann's concealment from the shoe company of the fraudulent use of credit cards in its store in Paterson. *See United States v. Keane*, 522 F.2d 534, 553 (7th Cir. 1975). Since defendants' purchases from Largemann were substantial (he testified that Kearney shopped at his store a couple of times per week over a period of more than two years), his continued complicity was important to the effectiveness of the scheme.

The evidence also showed the knowing acquiescence of other merchants who accepted credit cards realizing that they did not belong to the purchasers. Since the

conspiracy contemplated the continued patronage of the same business establishments, it was essential that the cooperative merchants continue to honor the cards. This they would do only as long as they could obtain reimbursement for the conspirators' purchases from the credit card companies. To that end, mailings to and from the companies and banks were necessary. The Government thus convincingly established that the entire, multi-tiered scheme came to fruition only after the invoices and reimbursement had been mailed.

■ Kearney also attacks the Government's evidence on the ground that it proves more than one conspiracy whereas the indictment charges a single conspiracy. He relies on *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), in which a variance between proof and indictment as to the number of conspiracies resulted in reversal of the convictions. Kearney, in his brief in this court, attempts to distinguish at least two separate groups using lost or stolen cards rather than the single conspiracy charged. He labels one group the "John Shedler-Alexander Hamilton Hotel group" and the other the "Peter Adamo group."

We believe that the evidence established the existence of only a single conspiracy, although perhaps it may be possible to discern two informal and overlapping groupings of co-conspirators within it. The Alexander Hamilton Hotel served as headquarters for the conspiracy, whose activities were coordinated there. Kearney was part of a small central core and, as such, had frequent dealings with most of the indicted co-conspirators. Even so, the participants in the conspiracy also dealt with each other, exchanging information and credit cards and shopping in groups of two. This was a single master conspiracy which also may have embraced subsidiary schemes overlapping each other in the form of smaller chain links. *United States v. Kenny*, 462 F.2d 1205, 1216 (3d Cir.), *cert. denied* 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972). As in *United States v. Kenny*, there is ample evidence in this case "of a large general

scheme, and of aid given by some conspirators to others in aid of that scheme." *Id.* at 1216.

Largemann testified that he was introduced to Adamo and to Kearney by John Shedler in the lounge of the Alexander Hamilton Hotel and, on at least four occasions, all four men drank together there. He also testified that Kearney frequented his store and that Adamo shopped there once using a credit card given to him by John Shedler.

Mullen, another indicted conspirator, stated that he also met Shedler, Kearney, and Adamo in the bar of the Alexander Hamilton Hotel. He spent one evening there undergoing initiation by the three into the use of lost or stolen credit cards. He testified that a group of conspirators, including Shedler, Kearney, and Adamo, met regularly every Tuesday and Friday at the hotel and dined almost every Friday evening on credit cards which were not their own. Moreover, Mullen stated that Adamo informed him a particular liquor store owner would cooperate if told: "I am part of the Paterson group. I know John Shedler and Vince [Kearney] and Peter [Adamo]."

Taken cumulatively, the Government's evidence persuades us that a single conspiracy to use credit cards illegally to defraud banks, credit card companies, and proper owners of the cards operated out of the Alexander Hamilton Hotel. Kearney appears clearly as a major figure in that conspiracy. Thus, we do not find a variance between the indictment and the proofs on this point.

Kearney next argues that the Government failed to prove any of the fourteen overt acts alleged under Count I, the conspiracy count, of the indictment and that such a deficiency in proof constitutes a fatal variance from the indictment. In the district court, the Government responded to this argument by asserting that, even assuming *arguendo* it had not proved any of the alleged overt acts, it had proved other overt acts in furtherance of the conspiracy. Proof of *any* overt act, it contended, is

sufficient, regardless of its mention in the indictment.

In this court, the Government would add a second string to its bow by insisting that its evidence in the district court in fact proved at least four of the overt acts. It also reiterates its argument that conviction for conspiracy may rest on proof of an overt act not alleged in the indictment.

■ There is general agreement that the Government is not limited in its proof at trial to those overt acts alleged in the indictment. *E. g., United States v. Quesada*, 512 F.2d 1043, 1046 (5th Cir. 1975) *U.S. appeal pending; United States v. Clay*, 495 F.2d 700, 706 (7th Cir.), *cert. denied*, 419 U.S. 937, 95 S.Ct. 207, 42 L.Ed.2d 164 (1974); *Napolitano v. United States*, 340 F.2d 313, 314 (1st Cir. 1965); *Marcus v. United States*, 20 F.2d 454, 456 (3d Cir. 1927). Moreover, the Government is under no obligation to prove every overt act alleged. *United States v. Williams*, 474 F.2d 1047 (5th Cir. 1973); *United States v. Fellabaum*, 408 F.2d 220, 223 (7th Cir.), *cert. denied sub nom. Pyne v. United States*, 396 U.S. 818, 90 S.Ct. 55, 24 L.Ed.2d 69 (1969).

Kearney asserts, however, in his brief to this court, that "[a]t least one of the overt acts alleged in the indictment must be proven at the trial. *United States v. Marks*, 364 F.Supp. 1022 (D.C.Ky.1973); *United States v. Westbrook*, 114 F.Supp. 192 (D.C.Ark. 1953)." We find the cases cited by Kearney at best ambiguous on this point.

The *Marks* court stated:

While the commission of an overt act must be alleged and proven, the act itself does not comprise the offense.

364 F.Supp. at 1028. *Accord, United States v. Westbrook, supra*, 114 F.Supp. at 199. It does not necessarily follow from this statement that the same overt act which was alleged must be proved. We read the statement as merely distinguishing conspiracy cases brought under section 371 which requires an act in furtherance of the scheme,

from those at common law where it was not necessary to allege or prove an overt act. *Fiswick v. United States*, 329 U.S. 211, 216 n.4, 67 S.Ct. 224, 227, 91 L.Ed. 196, 200 (1947). Under section 371 both the indictment and the proofs must indicate that the conspiracy did not remain *in vitro*. We do not believe either case cited by Kearney says more than that.

Having rejected Kearney's offered authority, we must then determine if there is more substantial support for the Government's proposition that it need not prove any of the overt acts alleged in the indictment. The Second Circuit in *United States v. Negro*, 164 F.2d 168 (2d Cir. 1947) announced the rule:

[A]n overt act is not part of the crime in the sense that the act alleged must be proved, where another unalleged overt act is proved.

\* \* \* \* \* \*

Consequently, we think the substitution of proof of an unalleged for an alleged overt act does not constitute a fatal variance. At most, such a variance justifies a request for continuance because of surprise. (footnotes omitted)

*Id.* at 173. This rule was reaffirmed in *United States v. Armone*, 363 F.2d 385, 400 (2d Cir.), *cert. denied*, 385 U.S. 957, 87 S.Ct. 391, 17 L.Ed.2d 303 (1966).

The *Negro* court also questioned an earlier holding of the Ninth Circuit that "it is fundamental that some overt act alleged must be proved," *Fredericks v. United States*, 292 F. 856, 857 (9th Cir. 1923). That holding was recently reexamined by the Ninth Circuit itself in *Brulay v. United States*, 383 F.2d 345 (9th Cir.), *cert. denied*, 389 U.S. 986, 88 S.Ct. 469, 19 L.Ed.2d 478 (1967). The court decided that *Fredericks* was no longer viable in light of new criminal statutes and Fed.R.Crim.P. 52(a) and announced that a variance between the single overt act alleged in an indictment and the one proved at trial constituted harmless error beyond a reasonable doubt.[5]

---

**5.** The Fifth Circuit held proper a district court judge's reading the jury the description of an overt act from the indictment although the defendant claimed the Government's proofs varied from the facts alleged. It stated: "substantial similarity between the facts alleged in the

■ We agree with the aforementioned Circuits that the harmless error rule may properly be applied when an overt act in furtherance of a conspiracy proven at trial differs from any of the overt acts alleged in the indictment. Such a variance does not amount to an amendment of the indictment to alter an element of the alleged crime of the sort held impermissible in *Stirone v. United States,* 361 U.S. 212, 218, 80 S.Ct. 270, 273, 4 L.Ed.2d 252, 257 (1960). The section 371 requirement that an overt act be committed need not necessarily be considered an element of the offense. "[A]n overt act is necessary to complete the offense," *Fiswick v. United States, supra,* 329 U.S. at 216, 67 S.Ct. at 227, 91 L.Ed. at 200; it may, however, be considered apart from the offense "either an indispensable mode of corroborating the existence of the conspiracy or a device for affording a *locus poenitentiae.*" *Braverman v. United States,* 317 U.S. 49, at 53, 63 S.Ct. 99, at 101, 87 L.Ed. 23, at 28.

■ Since the variance is not fatal per se, it must be examined in light of Fed.R. Crim.P. 52(a) to determine if it prejudiced defendant's substantial rights. *United States v. Somers,* 496 F.2d 723, 743–46 (3d Cir.), *cert. denied,* 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974). In this case, those rights are primarily fair notice and avoidance of double jeopardy. *Russell v. United States,* 369 U.S. 749, 763–64, 82 S.Ct. 1038, 1046, 8 L.Ed.2d 240, 250 (1962). We do not find that Kearney was surprised by the introduction of evidence of acts different from those alleged in the indictment because, as will become clear, the difference in the facts was slight. We note that he does not here claim surprise or double jeopardy. *United States v. McKee,* 220 F.2d 266, 268 (2d Cir. 1955). Moreover, he did not object to the evidence nor did he ask for a continuance. The only overt act attributed to Kearney by the indictment—sale of a credit card—is not the substantive offense

overt act and those proved is all that is required." *Strauss v. United States,* 311 F.2d 926, 932 (5th Cir.), *cert. denied,* 373 U.S. 910, 83 S.Ct. 1299, 10 L.Ed.2d 412 (1963).

charged by Count I. Thus, a claim of double jeopardy would be inapposite here.

■ The indictment charged that "on or about" certain dates eleven of the defendants represented themselves to be particular other persons. The other three acts are themselves harmless.[6] The evidence was sufficient to establish that some of the eleven defendants did in fact represent themselves to be named people by using credit cards issued in those names. However, no evidence was introduced which pinpointed the occasions upon which particular defendants used particular cards.

For example, Largemann testified that Edward Casale had used a credit card issued to George Hill, but he could not identify which George Hill invoice had been signed by Casale and therefore could not establish when Casale had used the card. Mullen testified only that three particular conspirators had used a card issued to James G. Price without mentioning dates. A tire merchant testified that Richard Hoy used a card issued to Roger G. Robinson but was unable to remember the date of purchase.

In sum, evidence was adduced to prove the commission of at least five of the overt acts alleged but there was no proof of the date of those acts. In *Strauss v. United States, supra,* 311 F.2d at 932, the court found the required "substantial similarity" between the facts alleged and those proved notwithstanding some variance in dates. We believe that, in the instant case, the evidence sufficiently shows the commission of at least five of the alleged acts of misrepresentation.

As to the three other acts, our search of the record reveals that the Government adduced evidence of all three at trial. As eight of the fourteen alleged overt acts were the subject of uncontroverted testimony, we find that the Government has

6. An overt act in furtherance of a conspiracy may itself be an innocent act. *Braverman v. United States, supra.*

proved the commission of the majority of the alleged overt acts.

## IV.

■ Finally, Kearney contends that the Government's summation contained references to his failure to testify, thus impermissibly burdening his constitutional privilege against self-incrimination under *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). On that ground, he moved for a mistrial in the district court, which motion was denied. Impermissible comments are "such as would lead the jury to conclude that the prosecutor was commenting on the failure of the accused to testify." *United States v. Chaney*, 446 F.2d 571, 576 (3d Cir.), *cert. denied*, 404 U.S. 993, 92 S.Ct. 543, 30 L.Ed.2d 546 (1971).

The three references to which Kearney objects are italicized:

1. Alex says that he got female shoes from Mr. Kearney. He says that he sold them in the hotel. *Nobody denied that. I believe it.* I submit to you it's the truth.

2. *Mr. Kearney said he didn't know that things had to be mailed in.* He knew darn well that as long as Mr. Largemann's store was being reimbursed he could continue to go back to the store and make the purchases.

3. [Referring to Mr. Largemann's testimony] In fact, Mr. Kearney went up one day *as he told you*, they didn't care what kind of credit card was on. He just took out a pile of credit cards and threw them down . . . .

■ The first remark evidently does not refer to Kearney's failure to testify. As the transcript reveals, Alex testified that he received women's shoes from Kearney and that he, Alex, sold them in the bar of the Alexander Hamilton Hotel where he worked as a bartender. The Government's reference to that testimony was apparently an attempt to defend Alex's credibility after the combined attacks of defense counsel in their summations.

■ The third remark is susceptible of interpretation as a reference to what Largemann told the jury, not what Kearney might have told them had he testified. Largemann in fact testified that on one occasion Kearney brought out a number of credit cards in his store.

The second remark the Government claims was an intended reference to the counsel for Kearney. The comment may have been a slip of the tongue in the heat of argument or it may have been intended to refer to Kearney's counsel. In any event, it refers to Kearney's testimony, not to his failure to testify. It might have been beneficial to Kearney. We do not believe that these comments could have given the jury the impression that reference was being made to Kearney's failure to testify.

Moreover, the trial judge neutralized any implication that Kearney had actually testified or that the Government was alluding to his failure to testify. The judge instructed the jury to disregard the "erroneous argument" by the Government in which the Assistant United States Attorney "unintentionally inserted the name of a defendant when he intended to mention the name of a witness when talking about the testimony." The judge also gave an instruction that an accused is not obliged to take the witness stand. We believe that the jury in all probability did not understand the Government to be commenting on Kearney's failure to testify, but that, if it did, the judge's instructions were sufficient to cure that impression.

The judgment of the district court will be affirmed.

HASTIE, Circuit Judge (concurring).

I join in the opinion of the court and add these supplementary observations only to elaborate my understanding of the controlling difference between this case and *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974).

In *Maze*, the Supreme Court held that the mailing of vouchers to a credit card company by motel owners from whom the accused had obtained services and goods by the use

of a stolen credit card was not sufficiently related to the complete execution of the wrongdoer's fraudulent acquisition of goods and services without paying for them to establish a violation of the federal mail fraud statute. The wrongdoing wayfarer was a stranger to the motel owners who accepted the credit card in good faith. Once he had obtained goods and lodging and had departed without paying for them, the wrongdoer had no interest in the occurrence or outcome of any resultant transaction between the motel operator and the credit card company. As the Supreme Court put it: "there is no indication that the success of . . . [the fraudulent scheme] depended in any way on which of his victims [the motel or the credit card company] ultimately bore the loss." 414 U.S. at 402, 94 S.Ct. at 649, 38 L.Ed.2d at 609.

Here, as Judge Rosenn points out, there is undisputed testimony that some merchants, among them defendant Largemann, who accepted the credit cards, knew Kearney and other conspirators and also knew that the credit cards they presented did not belong to them. In these circumstances, the willingness of these merchants to sell goods to the wrongdoers on credit depended upon their confidence that they could mail vouchers to the credit card companies and obtain payment. To create this assurance the wrongdoers often took advantage of a known practice of the credit card companies to honor individual small vouchers for not more than a certain sum, even though it should be determined that an invalid use had been made of their credit card. This practice applied only where the card in question did not appear on a current list of invalid cards, a so-called "hot sheet," that the credit card company had published to the trade. Kearney and his associates knew this and selected cards not yet on a hot sheet for numerous small purchases from knowing merchants. Only by thus tailoring these individual transactions so that the credit card companies would honor the mer-

chants' vouchers as mailed to them could the wrongdoers make their fraudulent scheme work, as it did, in their dealings with merchants who were privy to the wrongdoing. In all such instances the credit card companies were to be the victims and the use of the mails was an integral feature of the successful execution of the fraudulent scheme.

Thus analyzed, the present case is essentially different from the *Maze* case.