UNITED STATES of America

v.

Valerie HELGESEN, Defendant.

No. 80 CR 9(S).

United States District Court,
E. D. New York.

April 15, 1981.

Edward R. Korman, U. S. Atty., E. D. N. Y., by Ruth A. Nordenbrook, Asst. U. S. Atty., Brooklyn, N. Y., for plaintiff.

Suzanne Antippas, New York City, for defendant.

## MEMORANDUM OF DECISION

NEAHER, District Judge.

This case arises out of a 24-count indictment charging the defendant, Valerie Helgesen, with the knowing use of lost, stolen or fraudulently obtained credit cards to obtain substantial sums of money from Citibank, N.A., in violation of 15 U.S.C. § 1644(a), and with making false statements to that bank, which is federally insured, for the purpose of influencing its action with respect to her merchant's credit card account, in violation of 18 U.S.C. § 1014.[1] With the approval of the Court and the consent of the government, Rule 23(a), F.R. Cr.P., defendant signed a waiver of her right to a trial by jury. After hearing the government's evidence, and that offered by the defendant, the Court finds the defendant guilty as charged on all counts except count 8. The following constitute the Court's special findings of fact and conclusions of law. Rule 23(c), F.R.Cr.P.

## FINDINGS OF FACT

In November 1978, defendant and Jane Blangiardo opened a retail decorating business called the Brooklyn Heights Home Boutique, Ltd. ("HHB") at 216 Hicks Street in Brooklyn, New York. Defendant was the president and treasurer of the corporation and Blangiardo was its vice-president and secretary.

Just prior to their establishment of the business, defendant and Blangiardo opened a business checking account for HHB with Citibank, N.A., at a branch located on Montague Street in Brooklyn. Citibank's deposits are insured by the Federal Deposit Insurance Corporation ("FDIC").

In January 1979, defendant and Blangiardo applied to Citibank Sales Management Systems ("CSMS") for a merchant's credit card account which would allow them as proprietors of HHB to accept MasterCharge and VISA cards in making sales to customers. CSMS, like Citibank, is a subsidiary of Citicorp and is authorized to act for the latter in connection with credit card transactions. Although the contract opening a credit card account is entered into between the merchant and CSMS acting for Citicorp, the signatory for the latter is another subsidiary called Citicorp Credit Services, Inc. ("CCSI").

HHB's inventory consisted mainly of paint and related supplies such as brushes and rollers having a wholesale value ranging between $1,000 and $4,000. Other decorating items, such as wallpaper, curtains, blinds and shades were not kept in invento-

---

1. Section 1644 of Title 15, U.S.C., underlying counts 1 through 17, provides in relevant part:

"(a) Whoever knowingly in a transaction affecting interstate or foreign commerce, uses or attempts or conspires to use any counterfeit, fictitious, altered, forged, lost, stolen, or fraudulently obtained credit card to obtain money, goods, services, or anything else of value which within any one-year period has a value aggregating $1,000 or more ... shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

Section 1014 of Title 18, U.S.C., underlying counts 18 through 24, provides in relevant part:

"Whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of ... any bank the deposits of which are insured by the Federal Deposit Insurance Corporation ... upon any application, advance, discount, purchase agreement, repurchase agreement, commitment, or loan ... shall be fined not more than $5,000 or imprisoned not more than two years, or both."

ry but had to be ordered specially pursuant to a customer's selection from catalogues kept by HHB. The dimensions of HHB's store premises were approximately 20 feet by 40 feet. The business had incurred debts in starting up and, because of difficulties in developing a regular sales clientele, Blangiardo and defendant never "quite brought it above water."

Although the agreement opening the HHB credit card account provided for deposits to be made through the mail, direct deposits to a Citibank branch were accepted and credited to the account as cash deposits on the following business day. Prior to August 1979, HHB credit card sales invoices were deposited by mail, using pre-addressed envelopes provided at the time the merchant's credit card account was opened.

During the first seven months of 1979 the following monthly deposits of credit card sales invoices were made at Citibank:

| January | $1,008.66 |
| February | $805.13 |
| March | $593.57 |
| April | $1,174.16 |
| May | $1,318.50 |
| June | $1,485.96 |
| July | $532.41 |

These deposits reflected the volume of credit card sales normally experienced by HHB from January through July, 1979.

Defendant and Blangiardo jointly owned and operated HHB until, due to business and personal differences, they agreed that after July 30, 1979, defendant would operate the store alone. Except for the completion of a single decorating commitment, Blangiardo engaged in no activities relating to HHB's business after July 30, 1979.

Consuelo DiCiera was employed as an assistant in HHB from September 11, 1979, through September 21, 1979, when the store terminated operations. Her work schedule was irregular since defendant would tell her each day what hours she was to work the following day; but HHB was usually open for business Tuesdays through Fridays and on some Saturdays. DiCiera estimated that defendant was at the store 35% of the time. While at the store, DiCiera received two telephone calls, one a complaint about the repeated and unauthorized use of a stolen credit card, and the second from an employee of VISA inquiring about the use of the store's charge card plates. DiCiera reported both calls to the defendant, who said that she would take care of them.

During the time she worked at HHB, DiCiera took in an approximate total of only $30, since there were not many customers, and none involving credit card sales. She observed only one credit card transaction, which defendant handled.

Between August 17 and September 21, 1979, however, on almost every banking day, batches of HHB credit card sales invoices were submitted by direct branch deposit to the HHB account at Citibank. Citibank investigator Peter Jacina identified Government Exhibits 10 through 20, 51 through 67, 114, 129 and 174 as bank copies of credit card sales invoices retrieved from the regularly maintained archives of Citibank relating to the HHB account. In all, Citibank records reflected that 45 batches were deposited at the Montague Street branch representing a total face value of $221,384.34. More particularly, with regard to counts 18 through 24 of the indictment, Government Exhibits 10 through 20 establish that on the days noted below batches of invoices totaling the following face amounts were deposited:

| Date | Total face value of invoices |
| --- | --- |
| August 20, 1979 | $ 7,032.18 |
| August 30, 1979 | $ 5,758.00 |
| September 4, 1979 | $10,083.66 |
| September 6, 1979 | $ 7,932.89 |
| September 7, 1979 | $ 9,114.43 |
| September 10, 1979 | $14,108.16 |
| September 11, 1979 | $10,173.13 |

During this period also, funds were being regularly withdrawn, and on October 11, 1979, the balance of the HHB account was at zero. Most, if not all, of the credits generated by the deposits of the sales invoices were withdrawn by means of HHB checks, which had been written in whole or in part by defendant and presented to the bank for certification or for cashing.

Thomas Donovan, Director of the United States Postal Service Crime Laboratory and an expert questioned documents examiner, identified the handwriting which appeared on 29 HHB checks totaling $117,435.28 as that of defendant either as maker or endorser, or both. This handwriting testimony was corroborated by Blangiardo, who had seen defendant sign her name hundreds of times in the past three years.

Defendant was also identified by four Citibank tellers as the individual associated with the presentation for certification or cashing of an additional group of checks totaling $54,363.09. As already noted, defendant and Blangiardo were the only authorized makers of checks drawn on the HHB account at Citibank; and since Blangiardo had terminated her active participation in HHB on July 30, 1979, there were no checks bearing her signature after that date. Moreover, none of the Citibank tellers who testified identified Blangiardo as a person they associated in any way with the HHB account.

In signing the agreement of January 2, 1979, which established the HHB merchant's credit card account at Citibank, defendant, as "Seller" of credit card sales invoices, termed "items of indebtedness," represented and warranted to the bank

> "[that] such Indebtedness represents a valid obligation of a Cardholder;
>
> "[that] the transaction out of which such Indebtedness arose was in all respects a legal purchase of goods or services by a Cardholder . . . ."

In addition, each "sales/credit summary," the bank form accompanying and totaling each batch of credit card sales invoices deposited, expressly incorporated the representations and warranties contained in the January 2, 1979 agreement.[2]

The sales/credit summaries accompanying deposits to the HHB account made on August 20 and 30 and September 4, 6, 7, 10 and 11, 1979—the deposits underlying counts 18–24 of the indictment—bear the imprint of the HHB name and account number. The summaries accompanying the deposits underlying counts 10 through 15 also bear defendant's name on the line identifying it as "Seller's Signature." Also, Government Exhibit 115 contains summaries which accompanied deposits to the HHB account on 12 separate days between August 17 and September 14, 1979.

Donovan, the Postal Service handwriting analyst, identified the "Valerie Helgesen" signatures appearing on sales/credit summaries of HHB as those of defendant. These summaries accompanied batches of sale invoices for deposits made to the HHB account at Citibank on August 17, 20, 21, 22, 27, 29 and 31, 1979, and September 4 and 13, 1979. Inspector Donovan's identification is supported by the Court's own comparison of those signatures with unquestioned signatures of defendant on Government Exhibits 119, 120 and 121 (reproduced as Government Exhibit 203).[3]

Four Citibank tellers who had handled banking transactions with defendant identified her as the principal person who made deposits of batches of credit card sales invoices to the HHB account in August and September, 1979. Although defendant was accompanied at times by a man identified as Adeeb "Eddie" Asaad, it was she who

---

2. As noted above, Citibank in fact accepts deposits on behalf of CCSI, the legal entity, acting for Citicorp, which entered into the agreement with defendant dated January 2, 1979. See p. 210, *supra.* Each sales/credit summary contained the following legend:

> "Subject to the terms and conditions of the Seller's Agreement between Seller and CITICORP CREDIT SERVICES, INC. ('CCSI'), and making the representation and warranties set forth therein: (i) for value received, Seller hereby assigns, transfers and sells to CCSI all of the right, title and interest of Seller in and to the sales slips enclosed herewith and the indebtedness evidence thereby; (ii) Seller hereby delivers and assigns to CCSI the completed credit slips enclosed herewith."

3. See 28 U.S.C. § 1731 and *Moore v. United States,* 91 U.S. 270, 23 L.Ed. 346 (1875); *United States v. American Radiator & Stand. San. Corp.,* 433 F.2d 174, 192–93 (3d Cir. 1970), *cert. denied,* 401 U.S. 948, 91 S.Ct. 929, 28 L.Ed.2d 231 (1971); *United States v. Swan,* 396 F.2d 883 (2d Cir.), *cert. denied,* 393 U.S. 923, 89 S.Ct. 254, 21 L.Ed.2d 259 (1968).

obtained during that same time period certified checks in amounts ranging up to $18,-100 drawn on the HHB account and endorsed them for cashing. Also, when asked by the tellers why so many large checks were being cashed, it was defendant who explained that cash was needed for various business purposes and to pay customers who would not accept checks. The Court finds that defendant knowingly made this series of deposits and withdrew the cash generated by these credits.

VISA–USA, based in San Francisco, California, and Interbank, New York City, provide credit card security and informational services relating to the use of VISA and MasterCharge cards issued by member banks. This includes the compilation and regular updating of computer files of credit card numbers and maintenance of "status code" files indicating credit cards whose use is restricted because of a report from the issuing bank advising of fraud, loss, theft or other reason.

So-called "hot card" bulletins are periodically compiled from the computer files. These are newsprint lists of restricted cards, called the Card Recovery Bulletin for VISA and the Restricted Card List for MasterCharge, that are updated and sent to merchants on a weekly or biweekly basis. Separate bulletins are printed for different regions of the United States—six in the case of VISA and nine for MasterCharge—and the issuing bank informs VISA and Interbank as to whether a certain restricted credit card number is to be listed on one, some or all of the regional bulletins. A restricted credit card number is initially listed for a period of 30, 60 or 90 days, which may be extended on request of the issuing bank. If a merchant is tendered a credit card listed as restricted, or if for any reason he suspects an irregularity, it is his responsibility to telephone VISA or Interbank personnel, who will check the card number against their computer files and direct the merchant to "pick up," or retain, the card if it is restricted.[4]

A merchant's "floor limit" is the maximum value of a credit card sale he may make without prior telephone authorization from VISA, Interbank or the issuing bank. The floor limits for HHB were $75.00 for MasterCharge sales and $50.00 for sales made on VISA cards. Merchants with Citibank credit card accounts are also instructed to check the hot card bulletins for all cards presented to them, whether the purchases are above or below the applicable floor limit.

CSMS, on behalf of Citicorp banks, routinely instructs merchants regarding the amount and significance of the assigned floor limits and their responsibility to check the hot card bulletins. Neither Blangiardo nor defendant, whose signature as HHB president appears on the account information sheet and the agreement establishing the HHB account, questioned the information they were given at the time the credit card account was opened. According to Blangiardo, their practice had been to confirm by telephone credit card sales above $25.00.

From January through July of 1979 the weekly average credit card sale at HHB, as computed by Citibank and appearing on weekly statements sent to the store, varied widely. In some weeks there were no VISA or MasterCharge sales. For the weeks when credit card sales were made, the average sale ranged from $7.86 to $162.00 for MasterCharge, and from $10.28 to $297.77 for VISA.

Of the 3,210 sales invoices imprinted with MasterCharge and VISA credit cards and deposited to the HHB account between August 11 and September 19, 1979, with the single exception of one that apparently represented a bona fide credit card transaction, all but 18 were completed for amounts approaching but just below the respective floor limits of $75 and $50. All except one of the 18 invoices were only slightly above

4. In the case of VISA cards, a merchant who picks up a restricted card receives a minimum of $25 from the issuing bank.

the respective floor limits at HHB.[5] During the period in question, the weekly averages for credit card sale invoices deposited to the HHB account were as follows:

| Week | Average Master-Charge Invoice | Average VISA Invoice |
|---|---|---|
| August 17–23 | $71.89 | $46.67 |
| August 24–30 | $73.60 | $47.24 |
| August 31–Sept. 6 | $73.77 | $48.59 |
| September 7–13 | $74.22 | $49.27 |
| September 14–20 | $74.66 | $49.12 |

On September 20, 1979, Inspector Jeffrey Fowler and other agents of the United States Postal Inspection Service executed a search warrant in premises at 2059 East 23rd Street, Brooklyn, New York ("the 23rd Street premises"). In the course of this search five fliptop cigarette boxes containing 121 credit cards were found concealed in the kitchen ceiling. Also found, under a mattress in a bedroom, were 300 credit card sales invoices of the same type as the invoices in Government Exhibits 10 through 20. These invoices had been pre-imprinted with the 121 concealed credit cards and bore signatures corresponding to the names on those cards.

Government Exhibit 170 is a summary of the 3,210 invoices deposited to the HHB account and contained in Exhibits 10–20, 51–67, 114, 129 and 174, which cumulatively total the sum of $177,744.84. Each of these invoices was either generated by a credit card that the issuing bank wanted recovered or by one of the 121 credit cards recovered in the search of the 23rd Street premises. In all, Government Exhibit 170 contains invoices created through the use of over 200 different credit cards. With the exception of two invoices erroneously included,[6] Government Exhibit 170 summarized all HHB credit card sales invoices

retrieved from Citibank archives representing purported sales at HHB between August 11 and September 19, 1979.[7]

Dawn Tindal, of VISA–USA, checked against the VISA exception file a list of 167 names and credit card account numbers derived from the same Citibank records that were independently compiled into Government Exhibit 170 and found that for the period from mid-June through October 1979, 133 account numbers were on the exception file with a fraud code, indicating that the card had been reported lost or stolen; 27 had a code indicating that the issuing bank wanted the card recovered and was offering a reward for its return; one had a code indicating that inquiries to VISA were to be referred to the issuing bank; and six could not be found.

Donato Coppola, of Interbank, checked against Interbank's Restricted Card List a list of 103 names and credit card account numbers also derived from Citibank records relating to the HHB account. He found that 99 of those cards were on the restricted card list and the remaining four were determined to be either misprints or invalid numbers. Of the 99 restricted cards, 59 had fraud codes, 37 were coded "other" and three were coded "credit." Based on this information supplied by VISA–USA and Interbank, which corroborated the determinations of Citibank Inspector Facina, United States Postal Inspector Jerry Klapper testified that in his experience this pattern indicated that the invoices contained in Government Exhibit 170 did not represent legitimate sales at HHB.

In sum, all but a statistically insignificant handful of credit card sales invoices re-

5. The single invoice considerably above the $50 floor limit for VISA cards was one generated by card No. 4545455011577 bearing the name Ricardo G. Torrijos. This invoice, in the amount of $74.83, was the only one in a series of ten Torrijos invoices that was not immediately below the VISA limit. It was deposited to the HHB account in a batch that also contained several MasterCharge invoices.

6. The two invoices were dated, respectively, May 1979, and July 5, 1979, both before the time when the alleged scheme began.

7. Although Government Exhibits 122, 4 and 5 reflect total credit card deposits of $207,874.82 for this period, the variance was due to the fact that the search of Citibank records had not located every one of the sales invoices deposited to the HHB account.

trieved from Citibank archives relating to the HHB account for the period August 11 through September 19, 1979 had been generated by cards that had been restricted by their issuing banks or had been recovered at the 23rd Street premises, or both. In addition, a comparison of the list of cards found at 23rd Street and the chronological list of HHB invoices reveals that most, and possibly all, of the invoices submitted to the HHB account at Citibank during the ten days prior to September 19 were generated by the credit cards found at the 23rd Street premises.

The following holders of VISA and/or MasterCharge credit cards testified at trial:

| Count | Cardholder & Issuing Bank | Card Number* |
|---|---|---|
| 2 | William C. Jones<br>Tulsa, Oklahoma<br>(Bank of Oklahoma) | M/C #51041012534741<br>V #4644060533 |
| 3 | Beverly T. Maurice<br>Houston, Texas<br>(First National City<br>Bank of Houston) | M/C #51051011338556 |
| 4 | Edward Hernandez<br>Glendale, California<br>(United California<br>Bank) | M/C #51241106046004 |
| 5 | Lawrence Nash<br>Newport, Oregon<br>(Newport Bank,<br>Newport, Oregon) | M/C #51245791001026 |
| 6 | Fern F. Gaumer<br>Oberlin, Kansas<br>(Commerce Bank,<br>Kansas City, Mo.) | M/C #51524211070422 |
| 7 | Beverly S. Sloane<br>Claremont, California<br>(Security Pacific<br>Bank) | M/C #52040138085223 |
| 9 | Frieda Foster<br>Florence, South<br>Carolina<br>(Guarantee Bank &<br>Trust Company) | M/C #52282701047608 |
| 11 | John J. Lawlor<br>Stamford, Connecticut<br>(Rockland Trust Company, Rockland, Mass.) | M/C #520774504393084 |
| 12 | Michael P. O'Connor<br>Ann Arbor, Michigan<br>(Michigan Bank) | M/C #5411690555590017<br>V #4460155590013 |
| 13 | Mrs. Dennis V. Carlson<br>Minneapolis, Minnesota<br>(issuing bank not<br>identified) | M/C #521185771313 |
| 14 | Hasia Moreno<br>Holon, Israel<br>(Bank Leumi, Israel) | V #4580000200012243 |

15        Frederick R. Brodzinski M/C #53290908600885
New York, N.Y.
(Maryland National.
Bank)

16        Myra P. Sadker       M/C #53290571100650
Bethesda, Maryland   V  #4337150238436
(Maryland National
Bank)

\* VISA card indicated by "V" and MasterCharge by "M/C".

---

In sum, the listed credit cards were either lost or stolen from the holders prior to or during September 1979, while the latter were visiting New York City, and most of these cards were recovered in the search of the 23rd Street premises. None of the holders or their spouses had ever heard of HHB or used the cards to make purchases from HHB. Upon examination of numerous credit card sales invoices imprinted by the cards and included in deposits to HHB's account at Citibank during August and September 1979, each cardholder declared that the purchaser's signature appearing thereon was not his signature. Finally, these cardholders also testified that they had received notices of charges to their credit card accounts for purchases that they had not made. The Court finds that their testimony was credible in all respects beyond a reasonable doubt.

In summary, the Court finds that each of these 13 credit cards was lost, stolen or fraudulently obtained at the time it was used to generate the invoices deposited to the HHB account at Citibank. The evidence establishes beyond a reasonable doubt that the cards in counts 2, 3, 4, 5, 7, 9, 11, 12 and 14 were recovered at the 23rd Street premises hidden among more than 100 cards apparently being used to imprint numerous credit card sales slips of the same type as those deposited to the HHB account. The cardholder testimony concerning the disappearance of the cards in counts 2, 3, 4, 5, 6, 7, 9, 11, 12, 13, 14, 15 and 16 removed any possible doubt that those cards had in fact been lost, stolen or fraudulently obtained.

Regarding counts 1, 10 and 17, documentary evidence provided information with respect to the following credit cards:

| Count | Cardholder & Issuing Bank | Card Number |
|---|---|---|
| 1 | Marga Bock (Eurocard Deutschland, Frankfurt, Germany) | M/C #5232116034707 |
| 10 | Mary Jo Deli Chicago, Illinois (Northern Trust Bank, Chicago, Illinois) | M/C #518322050045791 |
| 17 | Pamela A. Stokes (Wells Fargo Bank, San Francisco, California) | M/C #51262031093531 |

Although these three cardholders did not testify, records were placed in evidence showing that the Stokes card had been taken from its owner and reported stolen on July 6, 1979, and that on August 15, 1979, the Deli card had been reported lost or stolen. Mr. and Mrs. Deli declared in affidavits that they had not made any of the dozens of HHB purchases apparently effected through the use of their card. Additionally, the Bock and Deli cards were recovered in the search of the 23rd Street premises on September 20, 1979. The credit card processing organizations responsible for these three cards gave each a "fraud" status. This evidence of loss or theft, moreover, was corroborated by the independent evidence of the unvaried pattern of use of these cards, which was identical to that of the other credit cards.

The Bock, Deli and Stokes cards were used within a short period in August and September, 1979, to generate multiple credit card invoices in amounts aggregating, respectively, $2,523.27, $2,292.26 and $1,770.10. This occurred when HHB typically stocked no more than $4,000 worth of merchandise and employee DiCiera witnessed only one credit card sale while she worked at the store. Thus it is highly improbable that any one of the named cardholders, who lived in distant places, came in off the street to make such a series of purchases. Invoices created through the use of these cards were deposited to the HHB account in each of the batches represented by Government Exhibits 10–20. Moreover, the coincidences that with one exception each of 90 purported sales on the Bock, Deli and Stokes cards was just below the card's floor limit at HHB, and that on each card more than one "sale" was made on some days, yet separate invoices were nonetheless generated—such that each invoice appeared to be for an amount just below the floor limit—demonstrates a pattern that Kathleen Blake, with 15 years experience as a credit card fraud investigator for the Bank of America, expressly identified as indicative of merchant, rather than cardholder, fraud.

The circumstance of this pattern, highly unusual in the light of daily experience and identical to that of the 13 cards discussed above, renders fanciful the suggestion that these three cards had been used by their legal owners to make 90 bona fide purchases at HHB within a period of weeks. The cumulative weight of these inferences and the direct evidence removes any reasonable doubt that the Bock, Deli and Stokes cards had been lost, stolen or fraudulently obtained by others prior to their use in relation to the HHB account at Citibank. *United States v. Elsbery,* 602 F.2d 1054, 1057 (2d Cir.), *cert. denied,* 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1980); *United States v. Lubrano,* 529 F.2d 633, 636 (2d Cir. 1975), *cert. denied,* 429 U.S. 818, 97 S.Ct. 61, 50 L.Ed.2d 78 (1976).

■ A different conclusion must be reached, however, with respect to the card described in count 8. The card itself, a MasterCharge card No. 52243000133515 issued in the name of "Subhash C. Hora," was not found nor did the cardholder testify at trial. Although the card was apparently used to create a number of HHB credit card sales invoices, which were deposited to the HHB Citibank account during late August and early September, 1979, there were no loss or theft reports or affidavits to establish how the card came to be listed as restricted. In the absence of any corroborating evidence, the single restricted card listing does not suffice to raise an inference beyond a reasonable doubt that the Subhash C. Hora card was lost, stolen or fraudulently obtained at the time of its use in connection with the HHB account. Accordingly, because of a failure of proof of this essential element, defendant is acquitted of the charge in count 8.

Finally, upon the evidence adduced at trial, the Court finds beyond a reasonable doubt that each of the batches of invoices in Government Exhibits 10–20, representing the deposits made to the HHB account on August 20 and 30, September 4, 6, 7, 10 and 11, 1979, which underlie the charges in counts 18 through 24, contained numerous invoices generated through the use of the

16 lost, stolen or fraudulently obtained credit cards discussed above.

## CONCLUSIONS OF LAW

■ Turning first to counts 1 through 17 of the indictment, alleging violations of 15 U.S.C. § 1644(a), the government had to prove as to each count the following essential elements beyond a reasonable doubt:

(1) the defendant's knowing use,

(2) in a transaction affecting interstate or foreign commerce,

(3) of a lost, stolen or fraudulently obtained credit card,

(4) to obtain more than $1,000.00 during a one-year period.

See *United States v. Lomax*, 598 F.2d 582 (10th Cir. 1979); *United States v. Kay*, 545 F.2d 491 (5th Cir.), *cert. denied*, 434 U.S. 833, 98 S.Ct. 119, 54 L.Ed.2d 94 (1977); *United States v. Mikelberg*, 517 F.2d 246 (5th Cir. 1975), *cert. denied*, 424 U.S. 909, 96 S.Ct. 1104, 47 L.Ed.2d 313 (1976).

■ The evidence at trial established beyond a reasonable doubt that more than $1,000 per card was obtained within a one-year period from the use of the 16 credit cards identified in counts 1–7 and 9–17 of the indictment. During August and September, 1979, over 3,000 invoices were deposited and credited to the HHB account at Citibank and the proceeds withdrawn by defendant in the form of certified checks. As the Court has already found, each of these cards, with the exception of the one referred to in count 8, was lost, stolen or fraudulently obtained at the time they were used in relation to the HHB account at Citibank.

The submission of a series of invoices generated through the use of a credit card identified in the indictment demonstrates a common scheme or design and qualifies the conduct alleged in each count as a "transaction" for the purposes of 15 U.S.C. § 1644(a). *United States v. Mikelberg, supra,* 517 F.2d at 250–52.

The element of "a transaction affecting interstate or foreign commerce" presents a mixed question of law and fact. See *Unit-ed States v. DiFrancesco*, 604 F.2d 769, 775 (2d Cir. 1979), *rev'd on other grounds*, —— U.S. ——, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980). See also *United States v. Calder*, 641 F.2d 76, 78 (2d Cir., 1981). Although the legislative history of 15 U.S.C. § 1644 cannot be said to provide much guidance on this point, it has been observed that

"... Congress, when considering Section 1644, was well aware of the credit card system in the United States and its problems, as well as the effect on interstate travel. The language of the statute demonstrates that Congress intended to use its broadest constitutional power to provide a useful tool for punishment of *any acts affecting interstate commerce* through the fraudulent use of credit cards. [Citation omitted.]" (Emphasis supplied.)

*United States v. Lomax, supra,* 598 F.2d at 584. Moreover, when Congress exercises its full constitutional power under the Commerce Clause, which has been described as "sweeping," it has been held that the effect on interstate commerce need be neither direct nor substantial. *United States v. Augello*, 451 F.2d 1167, 1169–70 (2d Cir. 1971), *cert. denied*, 405 U.S. 1070, 92 S.Ct. 1518, 31 L.Ed.2d 802 (1972) (conviction under Hobbs Act, 18 U.S.C. § 1951, upheld where effect on interstate commerce "merely potential or subtle"); *United States v. Tropiano*, 418 F.2d 1069, 1075 (2d Cir. 1969), *cert. denied*, 397 U.S. 1021, 90 S.Ct. 1258, 25 L.Ed.2d 530 (1970) (under Hobbs Act transactions "need affect interstate commerce only in a minimal degree"). Accord, *United States v. Daley*, 564 F.2d 645, 649 (2d Cir. 1977), *cert. denied*, 435 U.S. 933, 98 S.Ct. 1508, 55 L.Ed.2d 530 (1978). See generally, *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); *Katzenbach v. McClung*, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964). Compare *United States v. Mennuti*, 639 F.2d 107 (2d Cir., 1981).

With these principles in mind, the Court concludes that each of the transactions alleged in counts 1 through 17, with the exception of count 8, affected interstate or foreign commerce.

Initially, judicial notice is taken of the commonly known fact that Citibank, *N.A.* —for "National Association"—is an FDIC-insured bank and, as one of the world's largest banking institutions, engages in interstate and foreign commerce. *United States v. Mauro*, 501 F.2d 45, 49–50 (2d Cir.), *cert. denied*, 419 U.S. 969, 95 S.Ct. 235, 42 L.Ed.2d 186 (1974). Fed.R.Evid. 201. Each of the credit cards referred to in counts 1–7, 10–12 and 14–17 was issued by a bank located outside New York State and, in two cases, by banks located outside the United States. In addition, each of the cardholders identified in counts 1–4, 6, 7, 9–14 and 16 resided in States other than New York or lived abroad. Under these circumstances, the submission of the invoices to Citibank in New York resulted either in charges against the cardholders' accounts at their banks outside New York, or in the non-resident cardholders' receipt of inflated credit card account statements or notices to that effect, or both. Finally, continued use of a credit card appearing on a restricted card list in large part determines whether the issuing bank will request that VISA or Interbank reinstate the card on the bulletin following the initial period of listing. It is clear from the evidence that the preparation and distribution of the restricted card lists affects interstate or foreign commerce.

█ Regarding the element of knowledge and defendant's intent, the Court concludes on the basis of the direct and circumstantial evidence that defendant knowingly violated 15 U.S.C. § 1644(a) with regard to counts 1–7 and 9–17. The government was not required to show that defendant knew the specific details of how the credit cards were lost or stolen, nor precisely how those cards were used to imprint the invoices with the lost or stolen cards.[8] See *United States v. Alessi*, 638 F.2d 466, 475–76 (2d Cir. 1980); *United States v. Mikelberg, supra*, 517 F.2d at 253. Rather, the government had to establish that defendant knew that through the agency of others she was using lost or stolen credit cards by knowingly submitting to the HHB account invoices that had been fraudulently created through the use of such cards and not through bona fide purchases of goods at her store.

At trial, the government was prepared to concede to defendant that, for various technical and logistical reasons, the credit card numbers in question had not appeared on the hot card bulletins sent to merchants in HHB's region at the time of the events at issue. However, it was argued that this circumstance supported an inference of guilty knowledge. The Court agrees.

Defendant knew that she would be required to report the discovery of a proffered credit card on a hot card bulletin. She also knew that she would have to receive telephone authorization to effect a sale in an amount above the HHB floor limits. Therefore, defendant knew that a merchant who accepted a credit card not appearing on a restricted card bulletin for a sale beneath the store's floor limit would appear to be in full compliance with appropriate procedures and not chargeable with a failure to detect and report the use of a lost or stolen credit card. Viewed in this light, the remarkable coincidence that nearly all of more than 3,000 credit card invoices deposited were for purported sales at HHB just below the applicable floor limits, and the sheer repetition of the transactions, permits an inference of intent to evade detection of illegal activity. *United States v. Alessi, supra* 638 F.2d at 475–76. See *United States v. Payne*, 602 F.2d 1215, 1217 (5th Cir. 1979), *cert. denied*, 445 U.S. 903, 100 S.Ct. 1079, 63 L.Ed.2d 319 (1980). Moreover, the inference of defendant's intent to use invoices manufactured from lost or stolen credit cards to obtain "money . . . or anything else of value" (15 U.S.C. § 1644(a)) is supported by her simultaneous course of conduct in promptly withdrawing the funds generated by the scheme either in the form of cash or certified checks. *United States v. Kay, supra*, 545 F.2d at 493. See *United*

---

**8.** There was evidence indicating that defendant may have obtained invoices pre-imprinted with lost or stolen credit cards and thereafter proceeded to add the HHB imprint and fill in the fictitious sales information.

*States v. Stoddart,* 574 F.2d 1050, 1053 (10th Cir. 1978).

Defendant's argument that the requisite intent was not proved because it is conceivable that she unwittingly accepted lost or stolen credit cards presented by *others,* who made purchases just below the HHB floor limits in a knowing attempt to defraud and avoid detection, cannot be accepted. Defendant's intent was proved beyond a reasonable doubt by overwhelming circumstantial evidence which did not have to exclude all possible inferences other than that of guilt. *United States v. Elsbery, supra; United States v. Aadal,* 368 F.2d 962, 964 (2d Cir. 1966), *cert. denied,* 386 U.S. 970, 87 S.Ct. 1161, 18 L.Ed.2d 130 (1967). In this light and in view of the other evidence, it is incredible that defendant could have been unaware that her store was not in fact generating the volume of sales represented by the credit card invoices she deposited almost daily to the HHB account, and from which she withdrew large amounts of cash on an equally regular basis. The sudden and extraordinary increase in apparent credit card sales following months of slack business done on a relatively small inventory,[9] as well as the two telephone inquiries regarding credit card use at HHB, remove any possibility of ignorance so total as to avoid a finding of guilty knowledge. See *United States v. Hanlon,* 548 F.2d 1096, 1101 (2d Cir. 1977); *United States v. Bernstein,* 533 F.2d 775, 796–98 (2d Cir.), *cert. denied,* 429 U.S. 998, 97 S.Ct. 523, 50 L.Ed.2d 608 (1976). Even if the Court were to find that she had not initially conceived the scheme to defraud, her subsequent involvement is so clear as to compel rejection of any assertion that she was ignorant of its nature and extent and not a knowing participant in it. *Id.* See *United States v. Joly,* 493 F.2d 672, 675 (2d Cir. 1974).

It is further suggested that defendant was the innocent victim of a scheme perpetrated through HHB by Adeeb "Eddie" Asaad, as to whom the government con-

cedes there was evidence of involvement. The Court, however, must be guided by the principle that the degree of Asaad's participation and culpability, if any, is not relevant to the determination of whether defendant intended to play the part that she did in a scheme to defraud. See *Standefer v. United States,* 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980).

Moreover, the evidence simply would not support a finding that, because of Asaad's involvement or influence, defendant did not knowingly violate 15 U.S.C. § 1644(a). Defendant, as one of only two authorized signatories, was primarily responsible for the deposit of more than $200,000 in fraudulently created credit card sales invoices to the HHB account, and for the regular and complete withdrawal of the funds generated by the scheme. The government proved beyond a reasonable doubt that defendant herself went to Citibank, either alone or with Asaad, several times a week to effect this series of transactions. The consistent testimony of the Citibank tellers demonstrated that when defendant and Asaad came into the bank, she displayed a friendly and confident manner and played a major role in diverting the tellers' attention away from what they perceived to be a rather curious series of transactions. Rather than support some defense based upon a theory of mistake or duress, the evidence adduced at trial, when "examined in its totality, not by microscopic dissection of bits and pieces," *United States v. Barnes,* 604 F.2d 121, 156 (2d Cir. 1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980), proved beyond a reasonable doubt that defendant knowingly violated 15 U.S.C. § 1644(a) with regard to the credit cards referred to in counts 1–7 and 9–17.

Turning next to counts 18 through 24, alleging violations of 18 U.S.C. § 1014, as to each count the government was required to establish, beyond a reasonable doubt,

---

**9.** In late September 1979, defendant was interviewed in her apartment by United States Postal Inspectors and told that Citibank records showed that during the past few weeks over $100,000 worth of credit card sales invoices had been generated by HHB. Defendant replied that it was impossible because her store never maintained that amount of inventory.

(1) that Citibank's deposits were insured by the Federal Deposit Insurance Corporation,

(2) that defendant made false statements, and

(3) that defendant acted knowingly, for the purpose of influencing Citibank's action upon an advance, purchase or commitment.

See *United States v. Norberg*, 612 F.2d 1 (1st Cir. 1979); *United States v. Carr*, 582 F.2d 242 (2d Cir. 1978); *United States v. Cleary*, 565 F.2d 43 (2d Cir. 1977), *cert. denied*, 435 U.S. 915, 98 S.Ct. 1469, 55 L.Ed.2d 506 (1978); *United States v. Sabatino*, 485 F.2d 540 (2d Cir. 1973).

Since the government's proof that the deposits of Citibank are insured by the FDIC has not been seriously challenged, we may turn to the second element. The testimony of the Citibank tellers established beyond a reasonable doubt that defendant was primarily responsible for the deposits of at least 45 batches of credit card sales invoices, each one bearing the HHB imprint. Each sales/credit summary incorporated the "representation and warranties" that defendant had previously made by signing the January 2, 1979, account agreement, thereby taking contractual responsibility for all deposits to the HHB account at Citibank. It was also proved beyond a reasonable doubt that defendant signed at least 13 of the sales/credit summaries.

█ The express reiteration of these warranties, of which defendant was fully aware, and which included the warranty that each invoice submitted "represents a valid obligation of a Cardholder," was the legal equivalent of a statement as to the genuineness of the invoices. See *United States v. Payne, supra*, 602 F.2d at 1218. Moreover, defendant's conversations with the Citibank tellers throughout this entire series of transactions, in which she at least impliedly represented that the invoices evidenced debts legitimately owed to her store, reinforced her written representations and were oral statements which fall within the ambit of 18 U.S.C. § 1014. *United States v. Sackett*, 598 F.2d 739, 741–42 (2d Cir. 1979);

*United States v. Stoddart, supra.* Finally, as the Court has already found, each batch of invoices relating to counts 18 through 24 contained numerous invoices that had been generated through the use of lost, stolen or fraudulently obtained credit cards and did not represent bona fide sales at HHB resulting in valid obligations of cardholders. In the light of the discussion above, and mindful of the legislative purpose of 18 U.S.C. § 1014 "to cover all undertakings which might subject the FDIC insured bank to risk of loss," *United States v. Stoddart, supra*, 574 F.2d at 1053, the Court concludes that the presentation of these invoices, evidencing as they did fictitious transactions, were false statements within the meaning of the bank fraud statute. *United States v. Norberg, supra*, 612 F.2d at 4–5; *United States v. Payne, supra*, 602 F.2d at 1217–18. See *United States v. Gleason*, 616 F.2d 2 (2d Cir. 1979).

It is argued that since the agreement defendant signed and the sales/credit summaries refer to CCSI, rather than Citibank, the statements made, if any, cannot be said to have been *made directly to* "a bank the deposits of which are insured by the" FDIC.

While it is true that 18 U.S.C. § 1014 has in many cases been applied to false statements made directly to FDIC-insured banks in connection with a loan application, see, *e. g., United States v. Canas*, 595 F.2d 73 (1st Cir. 1979); *United States v. Braverman*, 522 F.2d 218 (7th Cir.), *cert. denied*, 423 U.S. 985, 96 S.Ct. 392, 46 L.Ed.2d 302 (1975), the statute itself is broadly worded and, by its terms, a violation exists whenever a person "knowingly makes any false statement . . . for the purpose of *influencing in any way* the action of" a bank insured by the FDIC (emphasis supplied). The courts have consistently construed this language as descriptive of the requisite intent and have expressly rejected assertions that the statute requires that the misrepresentations be material, or that the bank must actually rely upon them, or even that the bank must be aware of the false statements. *United States v. Johnson*, 585 F.2d 119, 124 (5th Cir. 1978) ("The focus is on the defendant's intent rather than on the victim. . . . The

[bank's] awareness of the fraud is not relevant"). *United States v. Cleary, supra,* 565 F.2d at 46. Accord, *United States v. Tokoph,* 514 F.2d 597 (10th Cir. 1975); *United States v. Kernodle,* 367 F.Supp. 844, 851–52 (M.D.N.C.1973), *aff'd,* 506 F.2d 1398 (4th Cir. 1974).

Moreover, reviewing the legislative history of 18 U.S.C. § 1014, the courts have repeatedly rejected a restrictive construction of the statute, deeming it designed to protect against a broad variety of schemes that may influence the bank "in any way." *United States v. Payne, supra,* 602 F.2d at 1219 ("the intent of Congress was to incorporate in one codal section all of the business transactions of any of the specified agencies"). *Kovens v. United States,* 338 F.2d 611, 618 (5th Cir. 1964) ("the purpose of § 1014 is to protect authorized functions of specified institutions from 'deceptive practices'"). Finally, the Court finds relevant here the observations that "section 1644 [of Title 15, U.S.C.] does not purport to be the exclusive vehicle for the federal prosecution of fraudulent credit card schemes . . . ." *United States v. Green,* 494 F.2d 820, 827 (5th Cir.), *cert. denied,* 419 U.S. 1004, 95 S.Ct. 325, 42 L.Ed.2d 280 (1974).

■ The government's proof established that Citibank was authorized to accept direct deposits of credit card invoices and to pay out in cash or by certified check the credited proceeds. It was also proven beyond a reasonable doubt that this form of transaction was utilized rather than deposit by mail addressed to CSMS or CCSI, as had been the practice of HHB for several months prior to August 1978. Moreover, even though the reiteration of the representation and warranties on the sales/credit summaries made reference to CCSI, defendant knew, of course, that she was submitting these summaries directly to Citibank, and knew that she had previously signed the agreement setting forth the representations and warranties. See *United States v. Sabatino, supra,* 485 F.2d at 544–45. In the light of the authorities discussed above, and since the statute itself does not in any form contain the suggested restriction, the Court sees no good reason why 18 U.S.C. § 1014 cannot reach statements made to a related corporation of an FDIC-insured bank and subsequently reinforced by direct oral representations to the bank, which are false and are made for the purpose of influencing the action of the bank.

Turning to the nature of the transactions in question, the original agreement and the sales/credit summaries term defendant the "seller" of invoices which are deemed to be assignable evidences of debt. Pursuant to the "purchase" of these invoices, Citibank in fact advanced over $177,000 in cash upon the presentment of checks signed by defendant. Under these circumstances, the government's proof established, beyond a reasonable doubt, that the purpose of these transactions was to influence the action of Citibank upon a "purchase" or "commitment to pay." See *United States v. Norberg, supra* (18 U.S.C. § 1014 covers presentation of fraudulent invoices to obtain release of monies previously committed); accord, *Kovens v. United States, supra.* See also *United States v. Payne, supra* (18 U.S.C. § 1014 reaches "check kiting" scheme whereby defendant received extensions of credit on a checking account by presentation of checks evidencing fictitious sales).

■ Finally, the government had to prove beyond a reasonable doubt that defendant acted knowingly, "for the purpose of influencing," Citibank to act as it subsequently did. The Court's discussion above, concluding that defendant knowingly used invoices generated by lost, stolen or fraudulently obtained credit cards to obtain large amounts of money, is fully applicable to the question whether she knew the statements she was making in connection with the HHB account were false. As the Court has already concluded, defendant had to know that all of the invoices she submitted could not represent bona fide debts owed to HHB as a result of genuine sales effected at the store. Defendant's intent with regard to a charged violation of 18 U.S.C. § 1014 may be inferred from all of the facts and circumstances in proof, *United States v. Braverman, supra,* 522 F.2d at 220, and the sheer repetition of these transactions allows an inference of willful misrepresentation. *United States v. Payne, supra,* 602 F.2d at

1217. In addition, the fact that defendant signed at least 29 checks which were successfully presented for cashing or certification is probative of her intent to make the deposits for the purpose of influencing Citibank to release these monies to her. *United States v. Stoddart, supra,* 574 F.2d at 1053. The conclusion is inescapable that defendant, as charged in counts 18 through 24, acted knowingly in making false statements for the purpose of influencing the action of Citibank in violation of 18 U.S.C. § 1014.

### VERDICT

Accordingly, it is the verdict of the Court that defendant is guilty of the offenses charged in counts 1 through 7 and 9 through 24 of indictment 80 CR 9(S). Defendant is acquitted of the charge in count 8.

The defendant and her attorney shall appear before the Court on April 15, 1981, at 4:00 p. m. for further proceedings preliminary to sentence.

SO ORDERED.